

**CHAPMAN LAW GROUP**

— **Health Care Attorneys** —

**Practice Areas**
Administrative Law
Cannabis Law
Correctional Law
CMS Matters
Criminal Defense
DEA Matters
Estate Planning
Health Care Audits
Health Care Compliance
Health Care Fraud & Abuse
Health Care Law
Health Care Transactions
HIPAA & HITECH Matters
Medical Malpractice Defense
NPDB/Peer Review Matters
Pharmacy Law
Professional Licensing
General Litigation

**Florida Offices**
6841 Energy Ct.
Sarasota, FL 34240
T. (941) 893-3449

701 Waterford Way
Suite 340
Miami, FL 33126
T. (305) 712-7177

**Michigan Office**
1441 West Long Lake Rd.
Suite 310
Troy, MI 48098
T. (248) 644-6326
F. (248) 644-6324

www.ChapmanLawGroup.com

May 15, 2023
*Via Electronic Mail Only*

Dermot W. Lynch, Esq.
U.S. Department of Justice - 1400
1400 New York Avenue NW
Washington, DC  20005
Email: dermot.lynch@usdoj.gov

> Re:  *United States v. Loey Kousa*
> Case No. 7:22-cr-00008-REW-EBA-1

<u>**NOTICE OF EXPERT TESTIMONY**</u>

**Michael W. Staples**

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) and Federal Rules of Evidence 702, 703, and 705, defense counsel provides notice that it may call Michael Staples as an expert witness in its case-in-chief.

If called, we anticipate that Mr. Staples will testify regarding Dr. Kousa's prescriptions identified in the indictment. He will elaborate on DEA regulations and guidelines for prescribing controlled substances and discuss Kentucky-specific rules and regulations as well. He will also explain how these rules and regulations changed in light of the COVID-19 pandemic.

Mr. Staples will also draw on the experience he gained as a former state medical board investigator. He will use this experience to describe the characteristics that suggest prescribing in bad faith and those that are present at "pill mills". Mr. Staples will also opine on why Dr. Kousa's practice deviates from these characteristics. He will also apply the referenced DEA regulations and guidelines for prescribing controlled substances, as well as the Kentucky-specific rules and regulations, and apply them to Dr. Kousa's prescribing; specifically, to the prescriptions identified in the indictment.

Mr. Staples' expert report will be provided to the Government no later than Thursday, May 18, 2023, and it will set forth his specific findings and conclusions.

Pursuant to revised Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, defense counsel further informs you that, to the best of his recollection, Mr. Staples has no publications to disclose, nor has he testified in any cases over the last four (4) years.

If necessary, Defendant will timely revise and supplement this disclosure. Remaining,

**Chapman Law Group**

**Ronald W. Chapman II, Esq., LL.M.**
*Counsel for Defendant Kousa*
1441 West Long Lake Road, Suite 310
Troy, MI  48098
T: (248) 644-6326
F: (248) 644-6324
RWChapman@ChapmanLawGroup.com


**Chapman Law Group**

**Matthew Pelcowitz, Esq.**
*Counsel for Defendant Kousa*
701 Waterford Way, Suite 340
Miami, FL  33126
T: (305) 712-7177
F: (248) 644-6324
MPelcowitz @ChapmanLawGroup.com

RWCII/MJP/sfa

**MICHAEL W. STAPLES, CMBI**
(513) 464-6721 • mstaples@ccghealthcare.com

**Healthcare Compliance**
Regulatory and Legal Health Care Compliance Expert

24 years of experience in criminal investigations, regulatory and criminal healthcare investigations, medical standards of care investigations, scope of medical practice investigations, healthcare regulatory and legal compliance, healthcare fraud investigations, public speaking, expert testimony, healthcare management, conflict resolution, drug diversion investigations, and drug diversion education.

**Demonstrated success record in:**

- Successful investigation and prosecution of licensed health care professionals.
- Successful investigation and administrative action of licensed healthcare professionals for standards of care, regulatory compliance, and administrative law violations.
- Successful assistance in Regulatory and Criminal Defense of Licensed Healthcare Professionals.
- Experienced with identifying, preventing, and deterring healthcare drug diversion and fraud.
- Dedication to drug diversion education for health care professionals.
- Proven record of healthcare regulatory compliance excellence.

**CORE COMPETENCIES**

• Criminal/Administrative Investigations    • Regulatory Compliance    • Pharmacy Investigations
• Drug Diversion Education    • Drug Diversion Investigations    • Expert Testimony
• Healthcare Fraud Investigations    • Witness/Suspect Interviewing

**HIGHLIGHTED CAREER ACHIEVEMENTS**

- 4+ years' experience as Director of Compliance for large pain management offices, national telehealth company, suboxone clinic, national chronic care management company, intensive outpatient treatment facility, and healthcare corporation.
- 9+ years' experience as a Police Detective focusing on Criminal Drug Crimes.
- 10+ years' experience as a Medical Board Enforcement Investigator focusing on Controlled Substance Prescribing Investigations, healthcare fraud, pharmacy investigations, prescriber education, and scope of practice investigations.
- Earned National recognition as a Certified Medical Board Investigator "C.M.B.I." from the National Federation of Medical Boards.
- Investigated over 1000 licensed healthcare professionals for Drug Trafficking, Standards of Care Violations, Healthcare Fraud, Medical Malpractice, Sexual Conduct Crimes, and other violations of Federal, State, and Administrative Rules and Laws.

- Conducted 1000's of suspect, patient, and witness interviews as a Police Detective, State Medical Board Investigator, Director of Compliance, and legal defense investigator.
- Audited thousands of pages of medical and healthcare-related records for standards of care, proper documentation, and regulatory compliance both as a State and defense investigator.
- Testified in hundreds of cases at Federal, State, Local, and Administrative Hearings both on the side of the Prosecution and the Defense.
- Developed and Presented hundreds of PowerPoint Presentations to Healthcare Professionals on Compliance, standards of care, identifying and deterring aberrant behaviors as a Government Investigator and private healthcare compliance specialist.
- Staples, M & Practice Shields, LLC. "Comprehensive Controlled Substance Prescribing in the age of increased regulations, legal challenges, and diversion." Presented in conjunction with West Virginia Interventional Pain Physicians accredited with Commendation from the West Virginia State Medical Association for 17.25 Category 1 CME. February, 2019
- Staples, M. & Harding, K "APRNs and Schedule II Prescribing in Ohio." Presented in conjunction with the Ohio Board of Nursing. Available for 6 Hours of Continuing Education Credit. Ohio Board of Nursing, Columbus, Ohio. March 31, 2014.
- Staples, M., Harding, K, & Galante, C. "APRNs and Schedule II Prescribing in Ohio." Presented in conjunction with the Ohio Board of Nursing and Ohio State Board of Pharmacy. Available for 6 Hours of Continuing Education Credit. Ohio Board of Nursing, Columbus, Ohio. November 25, 2013.
- Staples, M. "It Takes an Office: Protecting your Practice from Drug Diversion." Mercy Health Systems CME, June 15, 2015. https://youtu.be/tiFrhirb93M
- Former Director of Education and Training for Ohio Chapter of NADDI.
- Certified as a National Certified Investigator and Inspector Training (NCIT) both basic and specialized. Known as CLEAR Certification.
- Expert Report Admitted Cuyahoga County Common Pleas Court, State of Ohio, Case- CR-16607224A-D State of Ohio vs. Rogaciano Trocio, MD, Maria Siwik, RN, Virginia Paulino, and Janet Paulino
- Admitted as an Expert by the court, but did not testify in the case of United States v. Gilbert Ghearing, MD (2:19-cr-00010) District Court, M.D. Tennessee.
- Staples, M & Ronald Chapman II "How to prepare and respond to state and DEA inspections and Medicaid audits" Florida Pharmacy Association, available for .15 CEU, September 12, 2021

## PROFESSIONAL EXPERIENCE

**Chapman Consulting Group/ CCG Healthcare, LLC**      2021-Present
Troy, Michigan
Managing Consultant
*Assist healthcare clients with establishing and maintaining compliance plans
*Educate healthcare clients and their staff on healthcare regulatory and legal compliance
*Audit healthcare practices and businesses for standards of care and compliance with local, state, and federal rules and
  laws.
*Train and manage other compliance specialists for the company
*Audit and inspect healthcare-related records
*Conduct defense investigations on allegations of healthcare fraud, drug trafficking, and drug diversion.
*Review and assist with establishing sound compliance policies and procedures related to healthcare.
*Currently serve as the Compliance Officer for the following healthcare business and practices:
   1. Suboxone Treatment facility in the State of Tennessee
   2. National Telehealth company specializing in erectile dysfunction medications and testosterone.
   3. National Chronic Care Management Corporation
   4. Intensive Outpatient Treatment Facility in the State of Arizona
   5. Healthcare Corporation with multiple healthcare businesses in the State of Texas
   6. Pain Management Center in the State of Oklahoma.

**Interventional Pain Specialists, LLC**    2019-2022
Crestview Hills, Kentucky
Director of Compliance
*Regulatory and Legal Compliance
*Medical chart reviews and compliance
*Drug Inventory Auditor
*Staff Education
*HIPPA Compliance Officer

**Cincinnati Pain Physicians, LLC**          2017 – 2019
Cincinnati, Ohio
*Director of Compliance*
*Regulatory and Legal Compliance Management
*Identification of Drug Diversion in the patient population
*Medical Chart reviews and compliance
*Staff education
*Prevention of Drug Diversion in practice

**Practice Shields, LLC**
Fairfield, Ohio                                    2017 – 2021
*Founder and Owner*
*Dedication to ensuring regulatory compliance for health care practices and prescribers
* Health Care Practice and Prescriber Education
*D.R.A.P. Accreditation Program (Drug Resistant Accredited Practice)
*Practice and Business compliance audits and plan formulation.
*Practice and Drug Diversion Defense Techniques


**State Medical Board of Ohio**                 2007 – 2017
Columbus, Ohio
*Enforcement Investigator*
*Investigations of Ohio Regulatory and Criminal Rules and Laws
*Prescriber Controlled Substance Education
*Drug Diversion Investigations
*Healthcare Fraud Investigations
*CME Diversion program development and implementation
*Member of drug abuse and pharmacy diversion task forces


**City of Monroe Police Department**          1998 – 2007
Monroe, Ohio
*Police Detective*
*Criminal Drug Investigations, including pharmaceutical drug investigations.
*Theft and Fraud Investigations
* Warren County Drug Task Force Participant
*CVSA Lie Detection Operator
*Butler County Child Abuse Task Force Member
*Established a strict reporting system for allegations of stolen controlled medications


### EDUCATION and CERTIFICATION

Certified Medical Board Investigator (CMBI)
Basic and Specialized CLEAR Certification
OSU-Newark, Criminal Justice
Central Ohio Technical College, Criminal Justice
UC-Clermont Pre-Law
1995 Butler Tech Police Academy, Police Certification 1998

**May 9, 2023**

---

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**
**CRIMINAL ACTION NO. 7:22-cr-008-REW**

UNITED STATES OF AMERICA,                                    PLAINTIFF,

v.

LOEY KOUSA, M.D.,                                           DEFENDANT.

---

**Arraignment Prescribing Restriction case review requested on behalf of Loey Kousa, MD at the request of Mr. Ronald Chapman II Attorney at Law**

---

### I.    Qualifications of Expert

See attached *Curriculum Vitae*.

### II.   Case Background Information

Dr. Loey Kousa is a board-eligible internal medicine physician that has been practicing medicine since 1993 and has been practicing in Paintsville, Kentucky since 1994. Dr. Loey Kousa and Dr. Kita Kousa own and operate the East Ky Clinic located at 538 Main St. in Paintsville, Kentucky. Dr. Kousa has hospital privileges at ARH Paintsville and Highland's ARH Hospital.

Dr. Loey Kousa has no previous medical malpractice convictions, no previous Medical Licensure Board actions, and no past criminal convictions during his 29 years of practicing medicine.

Dr. Loey Kousa was indicted on April 28. 2022, following an investigation by State and Federal Agents into the alleged illegal Distribution of a Controlled Substance cts 1-5 (All related only to the prescribing of controlled substances to a federal task force agent acting in an uncover compacity as a patient of Dr. Loey Kousa), Health Care Fraud cts 6-7, and False Statements Relating to Health Care Matters cts 8-9.

All the alleged aforementioned criminal acts of Illegal Distribution of a Controlled Substance occurred during a Federal and State Declared Health Emergency relating to the Covid-19 Pandemic.

## III.   Sources Reviewed

### a.  <u>Federal Law and Code</u>

1. Title 21 1306.05 Manner of issuance of prescriptions.
2. Title 21 1306.03 Persons entitled to issue prescriptions
3. Title 21 1306.04 Purpose of issue of a prescription
4. Title 21 802(54)(D)
5. Title 21 829 (E) Prescriptions
6. Title 21 802 Unannotated Title 21. Food and Drugs

### b.  <u>DEA Diversion Guidance Documents</u> [1]

Question: Can telemedicine now be used under the conditions outlined in Title 21, United States Code (U.S.C.), Section 802(54)(D)?

Answer: Yes

While a prescription for a controlled substance issued by means of the Internet (including telemedicine) must generally be predicated on an in-person medical evaluation (21 U.S.C. 829(e)), the Controlled Substances Act contains certain exceptions to this requirement. One such exception occurs when the Secretary of Health and Human Services has declared a public health emergency under 42 U.S.C. 247d (section 319 of the Public Health Service Act), as set forth in 21 U.S.C. 802(54)(D). Secretary Azar declared such a public health emergency with regard to COVID-19 on January 31, 2020 [2]. On March 16, 2020, the Secretary, with the concurrence of the Acting DEA Administrator, designated that the telemedicine allowance under section 802(54)(D) applies to all schedule II-V controlled substances in all areas of the United States. Accordingly, as of March 16, 2020, and continuing for as long as the Secretary's designation of a public health emergency remains in effect, DEA registered practitioners in all areas of the United States may issue prescriptions for all schedule II-V controlled substances to patients for whom they have not conducted an in-person medical evaluation, provided all of the following conditions are met: ☐ The prescription is issued for a legitimate medical

---

[1] https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-016)%20CoronaVirus%20(Telemedicine)%20Updated.pdf?msclkid=1275b190cf1411ecaadc4e28753e4cb7
[2] https://www.hhs.gov/about/news/2020/01/31/secretary-azardeclares-public-health-emergency-us-2019-novel-coronavirus html

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 8

purpose by a practitioner acting in the usual course of his/her professional practice; ☐ The telemedicine communication is conducted using an audio-visual, real-time, two-way interactive communication system; and ☐ The practitioner is acting in accordance with applicable Federal and State laws. Provided the practitioner satisfies the above requirements, the practitioner may issue the prescription using any of the methods of prescribing currently available and in the manner set forth in the DEA regulations. Thus, the practitioner may issue a prescription either electronically (for schedules II-V) or by calling in an emergency schedule II prescription to the pharmacy, or by calling in a schedule III-V prescription to the pharmacy. The term "practitioner" in this context includes a physician, dentist, veterinarian, or other person licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which s/he practices to prescribe controlled substances in the course of his/her professional practice (21 U.S.C. 802(21)).

Important note: If the prescribing practitioner has previously conducted an in-person medical evaluation of the patient, the practitioner may issue a prescription for a controlled substance after having communicated with the patient via telemedicine, or any other means, regardless of whether a public health emergency has been declared by the Secretary of Health and Human Services, so long as the prescription is issued for a legitimate medical purpose and the practitioner is acting in the usual course of his/her professional practice. In addition, for the prescription to be valid, the practitioner must comply with applicable Federal and State laws.

1. *How to Prescribe Controlled Substances to Patients During the COVID-19 Public Health Emergency* [3]

Prior to COVID-19 Public Healthcare Emergency, Dr. Kousa always evaluated his patients in person and has never used any form of telehealth to evaluate and treat his patients. During this unprecedented healthcare emergency, Dr. Kousa has drastically modified his practice to comply with the DEA (federal) and The State of Kentucky guidelines. He integrated Telehealth into his practice. He had his own Two-way audio-video communication style. Dr. Kousa favored keeping the audio component to keep distance with patients but preferred the in-person over a Video when possible. Dr. Kousa believes that seeing the patient in person gives him more info compared to seeing a patient over video. Dr. Kousa individualized it case by case. Dr. Kousa saw patients in person if he deemed that necessary for proper medical decision making (Dr. Kousa has mentioned examples of one patient with incarcerated umbilical hernia requiring emergency surgery, another with deep venous thrombosis, and multiple other examples). Also, Dr. Kousa

---

[3] https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-023)(DEA075)Decision_Tree_(Final)_33120_2007.pdf (Exhibit A)

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 9

modified the structure of the operations in the office to further accommodate the guidelines (few of these changes are apparent in the videos provided by the government):

1. Every employee was working out of a physically separate space.
2. The clinic mandated all employees to wear a mask.
3. The clinic mandated measuring temperature of all employees on arrival and write it down in a log.
4. Only one employee at a time can be in the break room for lunch.
5. The clinic provided masks for patients who do not have one.
6. The clinic asked patients to pre-register and wait in their cars when possible.
7. The clinic reduced the number of chairs in the waiting rooms from twenty-two chairs prior to Covid-19 down to six chairs placed 6 feet apart to comply with the rules and maintain patient safety.
8. Signs were erected throughout the office informing everyone to keep proper 6 feet social distancing.
9. Communication between staff was via audio (telephone intercom) only when possible.
10. The number of phone lines was increased to 12 simultaneous lines to accommodate audio communications with patients and avoid a busy signal. Patients had a hard time reaching the clinic when we had 8 simultaneous lines.
11. The phone system was upgraded to accommodate two-way real-time audio-video.

### c. **HHA COVID-19 Public Health Emergency Declaration** [4]

As a result of the continued consequences of the Coronavirus Disease 2019 (COVID-19) pandemic, on this date and after consultation with public health officials as necessary, I, Xavier Becerra, Secretary of Health and Human Services, pursuant to the authority vested in me under section 319 of the Public Health Service Act, do hereby renew, effective April 16, 2022, the January 31, 2020, determination by former Secretary Alex M. Azar II, that he previously renewed on April 21, 2020, July 23, 2020, October 2, 2020, and January 7, 2021, and that I renewed on April 15, 2021, July 19, 2021, October 15, 2021, and January 14, 2022, that a public health emergency exists and has existed since January 27, 2020, nationwide.

---

[4] https://aspr.hhs.gov/legal/PHE/Pages/COVID19-12Apr2022.aspx

### d.  <u>Kentucky Board of Medical Licensure Newsletter 02/2020</u> [5]

#### 1.  *Reopening Healthcare Services*

The Board would like to share the Beshear Administration's guidelines, for reopening certain medical services and healthcare facilities in Kentucky. The first phase of reopening, which began on Monday, April 27, includes non-urgent/emergent healthcare services, diagnostic, radiology and lab services in outpatient, hospital settings, healthcare clinics and medical offices, physical therapy settings and chiropractic offices, optometrists and dental offices. [6]

According to the guidance, the following criteria should be included in all phases of Kentucky's reopening of healthcare services: • Use of telemedicine/telework instead of in-person whenever possible • Fever and COVID-19 screening prior to entry into healthcare facility • Discontinue use of traditional waiting rooms/common areas: o Use non-traditional options, e.g., wait in car, call ahead registration, etc. o Use modifications to ensure social distancing >6 feet and/or physical barriers • Universal masking for all persons for all direct person-person contact • Enhanced sanitizing and disinfecting; hand sanitizer stations available • Providers must procure required PPE through commercial routes • No visitors except end-of-life and assisting vulnerable populations • ALL phases subject to delay or roll-back if COVID-19 surge occurs Physicians are strongly encouraged to follow the guidelines and monitor the state's website, www.kycovid19.ky.gov for future updates on the various phases of the reopening of medical practices.

#### 2.  *Advisory on Prescribing During Declaration of Emergency:*

In response to the recent novel coronavirus (COVID-19) pandemic and subsequent declaration of State of Emergency by Governor Andy Beshear, the Board has received inquiries from licensees about prescribing controlled substances during this period. The Board would like to remind all of its licensees who are prescribing controlled medications (whether Schedule IIs, IIIs, IVs or Vs) of KRS 311.597(4) which calls upon licensees to conform with acceptable and prevailing medical practices and the provisions of 201 KAR 9:260 Section 2(2), which states: If a physician is unable to conform to professional standards for prescribing or dispensing controlled substances due to circumstances beyond the physician's control, or the physician makes a professional determination that it is not appropriate to comply with a specific standard, based upon the individual facts applicable to a specific patient's diagnosis and treatment, the physician shall document those circumstances in the patient's record and only prescribe or dispense a controlled substance

---

[5] https://kbml ky.gov/newsletter/Documents/2020-02%20Spring.pdf?msclkid=f67fd688cf1611ec8791c0dc2a000180
[6] https://chfs ky.gov/agencies/dph/covid19/healthcareservicereopening.pdf

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 11

to the patient if the patient record appropriately justifies the prescribing or dispensing of a controlled substance under the circumstances. The standards of acceptable and prevailing medical practices that apply under normal circumstances may not apply in a state of emergency. During this time it is particularly important that licensees responsibly exercise their best clinical judgment on a case-by-case and patient-by-patient basis, balancing a variety of factors (including being mindful not to contribute to the ongoing opioid epidemic). When considering whether to have an in-person patient visit, licensees should ask themselves whether the service provided would be retrospectively deemed necessary if the patient were to become infected by COVID-19 as a result of the visit. Where possible, use of telehealth technologies should be considered in an effort to limit and contain the spread of COVID-19. For instance, the current but temporary state of emergency may be a circumstance in which it would not be appropriate to require a patient to come in prior to refilling a prescription. The physician should consider whether the patient has a history of compliance with treatment directives; whether the patient is established and stable on the dose of medication. If it is a matter of refilling the same medication at the same dosage for an established patient, in order to avoid exposing the patient or others to the current environment, it may be appropriate to authorize a refill without an in-person visit. For patients beginning treatment of opioid use disorder with buprenorphine, in order to avoid exposing the patient or others to the current environment, it may be appropriate to screen the patient using telehealth technologies in order to determine whether an in-person examination is warranted. In this state of emergency, telehealth may be a clinically sound approach for some patients and some conditions, but for others it may not. It is appropriate to use telehealth resources to help make such a determination on patient-by-patient basis. The Board recognizes that the current state of emergency is a fluid environment requiring extraordinary effort, physical and mental, from many of its licensees. The Board understands the fine line of balancing treatment of individual patients with the protection of others and are grateful for its licensees' efforts to exercise sound judgment in unsound circumstances.

### e. Kentucky Senate Bill 150: Emergency COVID-19 Relief

Includes telehealth services by out-of-state healthcare providers with a patient in this state.

The State Board of Medical Licensure, the Kentucky Board of Emergency Medical Services, and the Board of Nursing may waive or modify state statutes or administrative regulations relating to the respective professions over which each Board has jurisdiction:

a. For licensure or certification requirements for health care providers who are licensed or certified in other states to provide services in Kentucky;

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 12

b. To relax the scope of practice requirements to allow health care providers to practice in all settings of care;

c. To allow physicians to supervise a greater number of other health care providers and to do so using remote or telephonic means;

d. To allow for rapid certification or licensure and recertification or re-licensure of health care providers;

e. To allow medical students to conduct triage, diagnose, and treat patients under the supervision of licensed health care providers;

f. For standards that are not necessary for the applicable standards of care to establish a patient-provider relationship, diagnose, and deliver treatment recommendations utilizing telehealth technologies; and

g. To reactivate the licenses of inactive and retired health care providers, including emergency medical providers and nurses, to allow them to re-enter the healthcare workforce.

*1. Telehealth Encounters and Reimbursement*

Unless specifically prohibited or limited by federal law, a provider who establishes a relationship with a patient in Kentucky may remotely provide health care services through telemedicine so long as:

Provider and patient are at an "appropriate site;" and

Remote care is in compliance with HIPAA.

The provider is not required to have previously conducted an in-person examination, and the encounter may be a new patient examination.

Provider must also:

- have an unencumbered license for a health care profession in another state,
- D.C., or territory;
- Never been disciplined by a licensing agency in any state or federal jurisdiction;
- Never had his/her license or permit for controlled substances suspended or revoked;
- Must register with the relevant state agency; and
- Offer only clinically appropriate, medically necessary services.
- Insurers must provide coverage for such services that are rendered to insureds in Kentucky.

7

- Reimbursement rates for the service shall not be more than for the same services delivered in-person and shall be determined between insurers and providers.

f. *UNITED STATES DISTRICT COURT EASTERN DISTRICT OF KENTUCKY SOUTHERN DIVISION- PIKEVILLE- Indictment No. 7:22-cr-008-REW*

g. *Undercover Videos and Audio Recordings provided to defense counsel related to the aforementioned case and indictment. The files were labeled- N1, N2, N3, N4, N5, N6, N8, N10, N11, N12, N13, N14, N16, N18, N19, N23N24, N25, N26, N27, N28, N29, and N33.*

h. *Dr. Loey Kousa's Medical Records, eKasper reports, and diagnostic testing reports related to his care of undercover identity- Michael Smith with a DOB of 4/10/1971.*

## I. <u>American Medical Association Code of Medical Ethics</u>

1. *1.1.1 Patient-Physician Relationships*

The practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering. The relationship between a patient and a physician is based on trust, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare. A patient-physician relationship exists when a physician serves a patient's medical needs. Generally, the relationship is entered into by mutual consent between physician and patient (or surrogate). However, in certain circumstances a limited patient-physician relationship may be created without the patient's (or surrogate's) explicit agreement. Such circumstances include: (a) When a physician provides emergency care or provides care at the request of the patient's treating physician. In these circumstances, the patient's (or surrogate's) agreement to the relationship is implicit. (b) When a physician provides medically appropriate care for a prisoner under court order, in keeping with ethics guidance on court-initiated treatment. (c) When a physician examines a patient in the context of an independent medical examination, in keeping with ethics guidance. In such situations, a limited patient-physician relationship exists.

AMA Principles of Medical Ethics: I,II,IV,VII.

8

## 2. *1.1.3 Patient Rights*

The health and well-being of patients depends on a collaborative effort between patient and physician in a mutually respectful alliance. Patients contribute to this alliance when they fulfill responsibilities they have, to seek care and to be candid with their physicians. Physicians can best contribute to a mutually respectful alliance with patients by serving as their patients' advocates and by respecting patients' rights. These include the right: (a) To courtesy, respect, dignity, and timely, responsive attention to his or her needs. (b) To receive information from their physicians and to have opportunity to discuss the benefits, risks, and costs of appropriate treatment alternatives, including the risks, benefits and costs of forgoing treatment. Patients should be able to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment. (c) To ask questions about their health status or recommended treatment when they do not fully understand what has been described and to have their questions answered. (d) To make decisions about the care the physician recommends and to have those decisions respected. A patient who has decision-making capacity may accept or refuse any recommended medical intervention. (e) To have the physician and other staff respect the patient's privacy and confidentiality. (f) To obtain copies or summaries of their medical records. (g) To obtain a second opinion. (h) To be advised of any conflicts of interest their physician may have in respect to their care. (i) To continuity of care. Patients should be able to expect that their physician will cooperate in coordinating medically indicated care with other health care professionals, and that the physician will not discontinue treating them when further treatment is medically indicated without giving them sufficient notice and reasonable assistance in making alternative arrangements for care.

AMA Principles of Medical Ethics: I,IV,V,VIII,IX.

## 3. *1.1.4 Patient Responsibilities*

Successful medical care requires ongoing collaboration between patients and physicians. Their partnership requires both individuals to take an active role in the healing process.

Autonomous, competent patients control the decisions that direct their health care. With that exercise of self-governance and choice comes a number of responsibilities. Patients contribute to the collaborative effort when they:

1. Are truthful and forthcoming with their physicians and strive to express their concerns clearly. Physicians likewise should encourage patients to raise questions or concerns.

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 15

2. Provide as complete a medical history as they can, including providing information about past illnesses, medications, hospitalizations, family history of illness, and other matters relating to present health.

3. Cooperate with agreed-on treatment plans. Since adhering to treatment is often essential to public and individual safety, patients should disclose whether they have or have not followed the agreed-on plan and indicate when they would like to reconsider the plan.

4. Accept care from medical students, residents, and other trainees under appropriate supervision. Participation in medical education is to the mutual benefit of patients and the health care system; nonetheless, patients' (or surrogates') refusal of care by a trainee should be respected in keeping with ethics guidance.

5. Meet their financial responsibilities with regard to medical care or discuss financial hardships with their physicians. Patients should be aware of costs associated with using a limited resource like health care and try to use medical resources judiciously.

6. Recognize that a healthy lifestyle can often prevent or mitigate illness and take responsibility to follow preventive measures and adopt health-enhancing behaviors.

7. Be aware of and refrain from behavior that unreasonably places the health of others at risk. They should ask about what they can do to prevent transmission of infectious disease.

8. Refrain from being disruptive in the clinical setting.

9. Not knowingly initiate or participate in medical fraud.

10. Report illegal or unethical behavior by physicians or other health care professionals to the appropriate medical societies, licensing boards, or law enforcement authorities.

AMA Principles of Medical Ethics: I, IV, VI.

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 16

## Expert Report and Opinion

I was contracted by Chapman Law Group to assist in the defense investigation regarding Loey Kousa, MD. I reviewed and analyzed all the aforementioned sources above in reference to the criminal prescribing allegations alleged against Dr. Kousa. This analysis is based on my over 20+ years of experience (see attached CV) in Law Enforcement Investigations, Undercover Operations, as a former Ohio Chapter Education and Training Coordinator for the National Association of Drug Diversion Investigators (NADDI), Healthcare Compliance, and Standards of Care Investigations.

My professional and personal experiences with Physicians reveal that most grow up in a very sheltered life with limited to no experience with the criminal elements of society. Most Physicians grow up in affluent neighborhoods and attend private schools. Physicians are typically raised to see and experience only the good in people. Physicians have to then dedicate their lives to education even at an early age in order to even have a chance of attending medical school and work academically more once they are accepted into medical school. The majority of Physicians choose this tedious educational path and career because they want to make a real difference and help people, which exposes the "Physician's metaphorical heartstrings" to manipulation from the criminal elements of society with which they have little to no experience. In my experience, this sheltered upbringing and the educational path they endure leads to "Naivety" in most physicians. That is why I developed and teach CME for healthcare practitioners on identifying and addressing aberrant behaviors in their patients and staff because most physicians do not even believe bad patients/staff exist due to their sheltered upbringing and oath to help their fellow man. Couple this sheltered upbringing with the fact that Physicians are taught and instructed to treat and trust their patients and you create a perfect storm in which a patient (or Undercover Agent portraying a patient) can manipulate a Physician to obtain the treatment they sought out. (I-1,2,3)

In the case of Dr. Kousa, an undercover law enforcement agent, referred to as "UC" hereinafter, posed as a new patient named Michael Smith on 4/15/2021 to attempt to obtain controlled medications for pain. The UC appeared to be overweight and 50+ years of age, and presented with multiple health problems including bipolar affective disorder, primary hypertension, familial hypercholesterolemia, depression, and left shoulder pain. (File N5-Video 8) UC stated that he was getting out of a truck the other day and stretched his shoulder carrying a piece of metal and it's aching and UC wanted something for a week or two for it. (Pain Medication). Dr. Kousa as a

11

result of the visit with UC made multiple medical decisions to order the following outside laboratory tests for UC- Complete Urinalysis (dipstick and microscopic), Fasting Lipid Panel (Total cholesterol, triglycerides, LDL , HDL ), Comprehensive metabolic profile, CPK Thyroid stimulating hormone T4 B12 level, Complete Blood Count with diff, Urine Toxic Screening (13 drugs), Hemoccult Testing times 3, left shoulder X-rays, and Prostate specific antigen. Dr. Kousa denied UC's request for pain medication for his left shoulder pain until he received the results of the ordered tests, but Dr. Kousa did refill the patient's non-controlled medications as he felt they were essential for the UC's health. Dr. Kousa conducted a hybrid telehealth visit on this date with UC in which he handles the majority of the office visit over the telephone but then personally sees and visually examines the patient when giving him his orders for tests and non-controlled medication prescriptions. (In accordance with D-1 and E)

UC calls back to Dr. Kousa (File N-6) on 4/20/2021. UC prefaces this recorded call by stating that he is calling the clinic to check on his pain medications and that he is expecting them to be sent to the pharmacy by Dr. Loey Kousa. to check on his pain medications. UC calls Dr. Kousa's office and tells staff that he is checking on his pain medication and seeing if they got results from the hospital on tests he took. Dr. Kousa gets on the phone with UC and advises him that he has a follow-up appointment on the 13th and that de does not have his test results back. UC argues with Dr. Kousa stating that the hospital told him what test results they can see Dr. Kousa can see as well. Dr. Kousa apologizes that he doesn't have the test results back yet and that UC is welcome to check back tomorrow. UC asks Dr. Kousa if he is connected to the hospital system and Dr. Kousa asks UC what does he need. UC states that he is calling to see if he called into the pharmacy. Dr. Kousa asks UC called what into the pharmacy. UC replies with the pain medication for my shoulder. Dr. Kousa inquires what pain medicine and the UC says that he doesn't know what he was going to prescribe. Dr. Kousa then states that he doesn't see that UC is taking any pain medications prior to today (Dr. Kousa had ran and reviewed UC prescription monitoring report- eKasper). UC replies with my shoulder, I told you I hurt my shoulder and you had me get an x-ray. Dr. Kousa again tells UC that in order to help him he needs the test results back he ordered and once he receives them, he will review and help him. UC pushes Dr. Kousa again stating "I can't go to the pharmacy today!" Dr. Kousa again tells UC that he cannot prescribe without the test results and that he told him that on day one. Dr. Kousa tells UC that he is delaying work and asks him if he wants to wait or what does he want him to do for him. UC says I guess I have to.

On 5/13/2021, UC goes for his second visit (Videos N-8, N-10) to Dr. Kousa's office. Dr. Kousa's staff takes UC's vitals and he asks if can sit in his car and she says yes. A little later UC is motioned inside the clinic by staff and advised that he had a copay and that Dr. Kousa is currently working on him (review tests and charts). UC was motioned into the clinic again at approximately 1:56:14 on the recording and meets with Dr. Kousa at the window. Dr. Kousa tells UC that his blood work all looked good and that he needs to get a lithium level for the next visit. Dr. Kousa also tells UC that he refilled his medications and gives him a follow-up appointment for June 10, 2021. The medications refilled were all non-controlled and were Lisinopril 20 mg by mouth twice daily, Crestor 20 mg by mouth every day, amlodipine 10 mg by mouth every day, Lexapro 20 mg by mouth every day, and Lithium 600 mg by mouth twice daily.

On 6/10/2021, UC goes for his third office visit (Videos N-11, N-12, N-13) to Dr. Kousa's office. Visit again was hybrid telehealth with Dr. Kousa talking with him over the phone and then seeing him at the window in person for visual examination and to give orders and prescriptions. Dr. Kousa advises UC at window (N-11- Video 1- 1:26:00) that he still needs a lithium test and UC asks what about his pain pills? Dr. Kousa asks UC to give him a second. Dr. Kousa calls UC for telehealth (N12-video 4, 14:35) Dr. Kousa advises UC that he will prescribe him Ultram (Kentucky Schedule IV opiate-like controlled substance) Qty 60, take every 6-8 hours as needed for pain. Dr. Kousa warns UC that the state is too harsh on these drugs and that he hasn't been taking it on his Kasper report. UC again expresses shoulder pain and asks for something stronger like Loratabs (Hydrocodone). UC asks Dr. Kousa if he can do better than that (Ultram). Dr. Kousa tells UC that maybe later he can, but he needs to try this (Ultram) first. (N-12- Video 4, 14:36) UC tells Dr. Kousa that he can't sleep or nothing and he has been chewing Tylenol (Which can cause stomach illness, liver damage, and even death at high dosages) and is just miserable. UC tells Dr. Kousa that he doesn't think Ultram will do anything and tells Dr. Kousa that he is always on time and does what he says to do (expressing a compliant patient). Dr. Kousa agrees with UC that he does and tells him maybe next time he can have something else but that he needs to try the Ultram first. UC again pushes Dr. Kousa stating that he would rather have something else (then Ultram). Dr. Kousa tells UC that state watches this stuff (Ultram) and every prescription he writes immediately goes to the state and he has to have a very good reason for prescribing it. UC pushes Dr. Kousa again stating that he was just hoping and that he tried to go without it (Pain medication), that he didn't say anything about the pain medication last visit, but he just can't get through it (Pain). Dr. Kousa again tells UC to just do this (try Ultram) and that next visit I can help you more. Dr. Kousa tells UC that he has to see it on his eKasper report that he got it (verifying he tried it for pain) and

reminds him to get his lithium level done. Dr. Kousa tells UC that the Ultram was sent to the pharmacy and reminds him that it goes to the state at same time and that Frankfort will know him now. (again, advising the patient that drugs like Ultram are monitored by the state and seemingly using the statement for compliance, as someone taking them illegally may worry about being monitored by the state.) Dr. Kousa also prescribed him prescription-strength Motrin for pain and a stomach pill in case the medications cause stomach upset.

On 7/8/2021, (N-16) UC calls Dr. Kousa's office and states that his car is broken down and cannot make his scheduled appointment. Dr. Kousa's staff asks UC if he wants to do a telehealth visit or does he need to see him (Dr. Kousa). UC advises that he will talk to Dr. Kousa on the phone. Dr. Kousa accommodates him on the phone and UC tells him he cannot make it to the office. Dr. Kousa advises UC he is fine and asks if there is anything new with him. UC advises that Dr. Kousa gave him the wrong paperwork for the lithium test and Dr. Kousa tells him to hold on and they get disconnected. (N-16 18:15) UC calls back and leaves Dr. Kousa a message stating that what he was calling about was to get a new pain medication. UC keeps calling the clinic back until he reaches a staff member and the staff member advises him, he needs to pay his copay and she will check if Dr. Kousa will allow him to pay cash next time.

(N-16, Audio recording 3- 1:26) Dr. Kousa gets on the telephone with UC and advises him that he will replace the Lithium order. UC asks again if he is going to give him some different pain medication and Dr. Kousa advises him that he can, but he needs the lithium level. UC advises Dr. Kousa that he didn't give him an order for that test. Dr. Kousa asks UC if he brought back the paperwork he allegedly got by mistake and UC says that he can when he can get a ride. Dr. Kousa tells UC that when he brings back the paperwork, he got by mistake he can pick up his Lithium test order and that he will call in his prescriptions. UC asks Dr. Kousa what he is going to call him in this time and that it's not that Ultram is it. (Sounding as if the Ultram didn't help him). Dr. Kousa advises UC that he can change it to Tylenol 3 and asks him if he has tried it before and UC says no. Dr. Kousa advises UC that Codeine works better than the Ultram. UC tells Dr. Kousa that he was hoping to get some Norco (Hydrocodone) or Oxycodone. Dr. Kousa agrees to give UC Norco (Hydrocodone) and gives him a follow-up appointment for August 5th at 1:30pm.

On 7/8/2021 and 7/9/2021, UC calls Dr. Kousa's clinic and Medicine Cabinet Pharmacy inquiring if his pain medications are ready (N-16 4,5,6 and 1,2,3,4 after #6) (N-16- Video 2, 3) UC calls Dr. Kousa's clinic and staff advises him he still has to pay his copay and he agrees to get a prepaid visa card and call back to pay the

copay. (N-16, Video 4) UC is finally able to get a prepaid visa card to work for his copay and he asks the staff how long till Dr. Kousa calls in his medicine to the medicine cabinet and they advise UC that Dr. Kousa said they should call him after UC called in. Dr. Kousa only prescribed UC a quantity of 30 pills of the lowest dose of Hydrocodone 5mg/325mg for his expressed pain.

On 8/05/2021, UC (N-18) on video stating that they had just come up with the idea to film his range of motion on his shoulders and wished they had thought of it earlier. The video is not properly positioned and what you see is a very limited view mostly of UC's head. UC acknowledges on video that he told Dr. Kousa that he had pain in his left shoulder since the first visit. (UC expresses pain which is subjective for each person and medication was prescribed by Dr. Kousa to treat his pain).

On 8/05/2021, UC (N-18 video 2,3,4,5,6) walks to clinic for his appointment from the Ramada Inn in Paintsville. UC at clinic checking in at 05:55 (N-18, video 2). UC waiting to be seen in videos 3,4, and 5. UC at clinic window in video 6 at 09:21. (Video 6- 0:11:30) UC at the window with Dr. Kousa and he gives him paper prescriptions. UC asks Dr. Kousa about his hydros (Hydrocodone) and Dr. Kousa advises him at the pharmacy. Dr. Kousa again only prescribed UC a quantity of 30 pills of the lowest dose of Hydrocodone 5mg/325mg for his expressed pain. Dr. Kousa also prescribed UC 800mg ibuprofen and Prilosec for his stomach, along with the regular non-controlled medications he has been getting since his first visit.

On 9/02/2021, UC (N-23) and Special Agent "Christy McCue" for a scheduled office visit at Dr. Kousa's office. UC sees Dr. Kousa briefly at the window and he gives him his prescriptions for non-controlled medication and refills Hydrocodone, again at lowest possible dose and only a quantity of 30 pills. (The video files provided to Dr. Kousa's previous attorney by the government are oddly numbered N-1-6, N-8, N-10-14, N-16, N-18, N-19, N-23-29, and then N-30. It appears there are several files missing and unsure if there is more video evidence of this encounter or other encounters between UC and Dr. Kousa.)

On 9/08/2021, UC (N-27) introduces audio recording that he is going to call Dr. Kousa's clinic to try and get Gabapentin. UC states that he may use a slang term for Gabapentin called a "Nurtin" that he says is used by people in the area that abuse drugs. UC calls clinic at 2:04 and asks staff if Dr. Loey in there and that he wants to add "Nurtin" to his prescription. Dr. Kousa's staff asks him what he is saying and he advises them Neurontin. Dr. Kousa's staff asks UC for his phone number and UC advises staff that he was going to ask Dr. Kousa the other day but he forgot. The staff advised UC they would give Dr. Kousa the message. Staff calls UC back and advises

that he needs to pay his copay and UC asks staff if Dr. Kousa is going to do that for me (Prescribe Neurontin) to see it works? Staff advises UC that Dr. Kousa wants to talk to him first. UC advises staff that Skeeter Castle says it works for him and staff advises that the medication works for a lot of people. UC advises that is what he wants. (N-27-5:09) Dr. Kousa picks up the phone and asks UC what is going on with him today. UC tells Dr. Kousa that Skeeter says that Gabapentin with Hydro works well for him and all the other people that use it and he wants to see if he can do that. Dr. Kousa asks him to confirm his date of birth. UC says Skeeter telling him about it and he had to call Dr. Loey. Dr. Kousa asks UC what he needs it for his back and UC replies his shoulder and tells Dr. Kousa that he x-rayed it and everything. Dr. Kousa advises UC that the problem it (Neurontin) is not for shoulder it is for nerve pain, pinched nerves, and diabetic pain and that it is really not for shoulder. UC tells Dr. Kousa that they talked about this before how it (Pain) travels from his neck, and back, and goes into his shoulders. UC says doc you told me it (pain) would travel on me. Dr. Kousa asks UC if they did an x-ray on his neck and back and UC says he did. Dr. Kousa advises UC that he needs to check. UC tells Dr. Kousa that he mentioned it (Neurontin) early on but you wanted to start… Dr. Kousa tells UC there is a shoulder x-ray but no neck or back x-ray. Dr. Kousa advises UC if he has neck and back pain he needs to order back and neck x-rays and as soon as UC does them, he will help with that. UC states I have to go thru all that again. Dr. Kousa advises UC that the state audits us why you are prescribed or what. Dr. Kousa asks UC if he can leave him an order for the x-rays. UC states what if I get more hydros, I am just trying to take care of this (pain). Dr. Kousa advises UC he can write it (Neurontin) he just needs a reason for it and tells him to do the x-rays. Dr. Kousa finally agrees to write UC a low dose of Neurontin 100mg take 2x day for only three weeks till his next appointment. Dr. Kousa tells UC to pick up orders for back and neck x-rays.

On 9/09/2021, UC(N-28) at Dr. Kousa's clinic picked up x-ray orders. UC has Special Agent McCue (N-29) pick up Neurontin from the pharmacy for him.

On 9/30/2021, UC(N-33) called clinic claiming that he cannot make it to the office today and wanted to do visit over the phone. UC pays the copay over the phone and Dr. Kousa picks up phone (N-33, 7:15). Dr. Kousa asks UC how he is doing and UC advised Dr. Kousa that he cannot make it in to see him and wanted to see if they could just do it over the phone. Dr. Kousa advises that it is fine and asks him to confirm his date of birth. Dr. Kousa confirms UC had an appointment today and says you need all your prescriptions and says they have all been sent to the pharmacy. Dr. Kousa gives UC an appointment for October 28th at 10am. Dr. Kousa refilled UC's low dose hydrocodone 5mg/325 qty 30 and the low dose Neurontin 100mg qty 60 along with his regular non-controlled medications.

16

Dr. Kousa advised me that UC's call caught him off guard and he didn't have time to review all of UC's medical records till after the unscheduled call from UC. Dr. Kousa stated that he noticed that UC had not done the back and neck x-rays and also had not got the lithium level done. Dr. Kousa stated that he called the Medicine Cabinet Pharmacy and UC had already picked up his medications. Dr. Kousa stated that the medicine cabinet advised him that UC was mostly only picking up his controlled medications. Dr. Kousa stated that at this point he realized that UC was not a good patient and when he generated the note for the scheduled October 28th visit, he did not include the controlled medications in the UC's medical record because he was no longer going to fill those medications. UC ended up not showing up for his scheduled October 28th visit.

In my opinion, the investigation and undercover operation involving Dr. Kousa were not in accordance with the way we trained when I was with NADDI and the previous undercover physician operations I was personally involved in. First off, they utilized an older and overweight undercover officer with listed health problems to gauge whether Dr. Kousa was improperly prescribing controlled medications. Any patient fitting this profile would be more believable to a legitimate physician as having pain issues because of advanced age and conditions. If the agents wanted to see if Dr. Kousa was actually improperly prescribing controlled substances, why did they not send in a young and fit agent with no health issues or co-morbidities to see if he could obtain controlled substances from Dr. Kousa. Secondly, the UC complained and expressed specific pain issues numerous times during his in-office and telehealth visits and even complained of having to eat a lot of Tylenol just to make it through the night. Pain is an FDA-approved use for opiate pain medications. When I was involved in assisting with and training on undercover physician operations, we advised undercover agents to stay away from complaining of legitimate medical issues such as specific pain to avoid the doctor's medical, professional, and ethical duties to treat patients. Thirdly, it took three visits with Dr. Kousa and additional unsolicited phone calls by UC to Dr. Kousa before he prescribed UC anything for pain and that was only after he received the results of the shoulder x-ray and urine drug test. We also would not have the undercover operatives submit to diagnostic testing unless it was an in-office urine drug test to further show the target doctor that the UC was not taking the prescribed medications for medical reasons. Dr. Kousa then only prescribed him a low dose of Ultram a schedule IV drug for his expressed left shoulder pain and acknowledged to the patient that he was checking his eKasper report. Fourthly, Dr. Kousa only prescribed low-dose hydrocodone after the UC expressed needing different pain medication and specifically not Ultram. UC says when Dr. Kousa agrees to call in pain medication

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 23

for him: "its not that Ultram is it?" Giving Dr. Kousa the impression it did not work for him. Dr. Kousa tried to prescribe him Tylenol 3 with codeine first, but UC stated he was hoping to get Hydros or oxycodone. UC several times during this overall undercover pushed and manipulated Dr. Kousa into prescribing controlled substances which is not typically necessary if Dr. Kousa was illegally prescribing controlled substances as alleged. Fifth, UC called Dr. Kousa wanting to add Neurontin with his hydrocodone which he claims has worked for other patients. UC does not express it is needed for him to get a more euphoric effect but just says it works well for other patients. When Dr. Kousa questions UC's need for the additional medication he claims pain that travels from his neck, back, to his shoulder and again attempts to manipulate Dr. Kousa by saying that he already got a neck and back x-ray when asked by Dr. Kousa and also claiming the Dr. Kousa had previously told him that his pain would travel. Dr. Kousa however confirmed that no back or neck x-ray was obtained and ordered both. Dr. Kousa eventually offered UC a three-week trial of low dose Neurontin 100mg 2x day and told him to pick up and get the neck and back x-ray done. UC came in and picked up the neck and back x-ray demonstrating a seemingly compliant and legitimate patient. Sixth, in my professional experience illegal prescribers of controlled substances do not try less powerful and less sought-after pain medications first for their patients, do not take 3 visits before they prescribe controlled substances, and then only prescribe after proper testing is done by the patient (X-ray and urine drug screen), do not focus on the patient's overall better health including preventative testing and non-controlled medications like Dr. Kousa did with the UC, and illegal prescribers definitely do not prescribe the lowest dose possible of controlled substances to their patients in conservative quantities of only 30 pills a month as Dr. Kousa did with this UC. Seventh, illegal prescribers of controlled substances usually have long lines and crowded waiting rooms due to wanting to see as many patients as possible to maximize profit and a review of the aforementioned undercover videos shows nothing like that in Dr. Kousa's office. As a matter of fact, Dr. Kousa's patients are observed in the undercover videos waiting extended periods of time to see Dr. Kousa because of the time it took him to review medical records, ekasper reports, testing results, and to see or speak to each patient, actually lowering the number of patients he could see in a day and not maximizing his profit as is indicative with criminal prescribers. Lastly, illegal prescribers of controlled substances in my experience typically have past medical board actions, DEA actions, and/or past criminal investigations. Dr. Kousa has an unblemished physician record for the past 29 years of practicing medicine and doesn't even have a medical malpractice conviction.

Dr. Kousa's medical care and prescribing to the UC were in my professional opinion in accordance with the documented standards of care and guidelines during the State of Emergency related to the Covid-19 Pandemic as listed in the aforementioned source documents listed as B-1, 2, C, D-1, E, and I-1-3.


**Respectfully,**


*Michael Staples*


**Michael W. Staples, CMBI**

19



**Practice Areas**
Administrative Law
Cannabis Law
Correctional Law
CMS Matters
Criminal Defense
DEA Matters
Estate Planning
Health Care Audits
Health Care Compliance
Health Care Fraud & Abuse
Health Care Law
Health Care Transactions
HIPAA & HITECH Matters
Medical Malpractice Defense
NPDB/Peer Review Matters
Pharmacy Law
Professional Licensing
General Litigation

**Florida Offices**
6841 Energy Ct.
Sarasota, FL 34240
T. (941) 893-3449

701 Waterford Way
Suite 340
Miami, FL 33126
T. (305) 712-7177

**Michigan Office**
1441 West Long Lake Rd.
Suite 310
Troy, MI 48098
T. (248) 644-6326
F. (248) 644-6324

www.ChapmanLawGroup.com

May 15, 2023
*Via Electronic Mail Only*

Dermot W. Lynch, Esq.
U.S. Department of Justice - 1400
1400 New York Avenue NW
Washington, DC  20005
Email: dermot.lynch@usdoj.gov

> Re:   *United States v. Loey Kousa*
> Case No. 7:22-cr-00008-REW-EBA-1

<u>**NOTICE OF EXPERT TESTIMONY**</u>

<u>**Sean M. Weiss**</u>

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) and Federal Rules of Evidence 702, 703, and 705, defense counsel provides notice that it may call Sean Weiss as an expert witness in its case-in-chief.

If called, we anticipate that Mr. Weiss will testify regarding the billing of the CPT codes identified in the indictment.  He will elaborate on when these codes are properly submitted for reimbursement to Medicare and Medicaid and why they were properly submitted in this case.

Mr. Weiss will draw on his experience and training with health care billing and coding and he will identify how COVID-19 impacted the delivery of health care services to patients, as well as the ways in which it impacted billing for treatment and services. Mr. Weiss will also elaborate on why the CPT codes identified in the indictment were medically necessary.

Mr. Weiss' specific conclusions on these issues outlined above are set forth in an expert report, which is included with this disclosure.

Pursuant to revised Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, defense counsel has provided a list of testimony Mr. Weiss has provided in the last four (4) years. Counsel further informs you that, to the best of his recollection, Mr. Weiss has no publications to disclose.

If necessary, Defendant will timely revise and supplement this disclosure. Remaining,

**Chapman Law Group**


**Ronald W. Chapman II, Esq., LL.M.**
*Counsel for Defendant Kousa*
1441 West Long Lake Road, Suite 310
Troy, MI  48098
T: (248) 644-6326
F: (248) 644-6324

**Matthew Pelcowitz, Esq.**
*Counsel for Defendant Kousa*
701 Waterford Way, Suite 340
Miami, FL  33126
T: (305) 712-7177
F: (248) 644-6324


RWChapman@ChapmanLawGroup.com          MPelcowitz@ChapmanLawGroup.com

RWCII/MJP/sfa
Enclosures

# Curriculum Vitae of Sean M. Weiss

### CHC, CEMA, CMCO, CPMA, CPC-P, CPC, CMC, CMIS, CMOM

**Professional Experience:**

- DoctorsManagement, LLC, Knoxville, TN – Partner and Vice President of Compliance, Dec. 2012 to present – The below are organizations under contract to DoctorsManagement for whom I serve as the Compliance Officer or in another Senior Capacity:
    - Investigator / Reviewer for the State of North Carolina Medical Board – 2021 - Current
    - Articularis Health Group (AHG), Charleston, South Carolina – Chief Compliance Officer, 2019 – Current
    - OrthoFlorida / IHBS, Tampa, FL – Chief Compliance Officer, 2019 – Current
    - Boston Neuro Behavioral Associates, Boston, Massachusetts – Compliance Officer, 2020 – Current
    - Athens Orthopedic Clinic (AOC), Athens, Georgia – Compliance Consultant to Chief Compliance Officer, 2017 – Current
    - Georgia Bone and Joint, Newnan, Georgia – Compliance Officer – 2018 – Current
    - Array Skin Therapy (AST), Orange County, California – Compliance Officer – 2018 – Current
    - Chicago IVF – Chicago, Illinois – Compliance Officer – 2018 – Current
    - PJ Therapy, Elberton, Georgia – Compliance Officer – 2019 – Current
    - Adventist Health System, Orlando, FL – Interim Director of Coding, 2014 to 2016
    - Inova Health System, Fairfax, VA – Senior Director of Revenue Integrity, 2018 and 2019
- DecisionHealth, LLC, Gaithersburg, MD – Vice President/Chief Compliance Officer, Jan. 2008 to Nov. 2012
- The CMC Group, LLC, Atlanta, GA – Senior Partner and Chief Compliance Officer, July 2003 to Dec. 2007
- Columbia/HCA, Brentwood, TN – Physician Consultant, 1999 to 2001
- Tenet Health System (Tenet Physician Services of the Southeast), Atlanta, GA – Senior Analyst & Compliance Officer (1998-1999)
- The Medical Management Institute, Alpharetta, GA – Director of Consulting and Senior Management Consultant, 1996-1998, 2001-2003

**Compliance Officer Responsibilities:**

- Consistently meet compliance plan goals and objectives, as defined and agreed to by the Board and Senior Management Team.
- Assist with the development, management, coordination, and continual improvement of the compliance plan.  Ensure the effectiveness of compliance efforts.  Work to promote

corporate compliance with all applicable laws, regulations, rules, and policies and procedures of governmental authorities and payers.

- Assure that the compliance plan is reviewed and updated at least annually.
- Lead the corporate compliance plan development process. Work with administration for furthering plan development.
- Develop, review and maintain all compliance policies, procedures, standards of conduct, and employee compliance handbooks.
- Monitor program effectiveness and recommend and make appropriate modifications.
- Interact with government officials, third party payers, and legal and consulting counsel regarding compliance issues, including plan development, audits, investigations, and other activities.
- Oversee ongoing training and education of physicians and employees, regarding billing, coding, and other issues subject to the compliance plan, upon hire and at regular intervals.  Maintain current records and documentation related to employee training and other compliance-related activities.
- Identify areas of potential high risk (as related to compliance issues), monitor those areas, and make recommendations and/or take corrective actions.
- Supervise audits performed by internal personnel and external firms.  Review audit findings.  Report to the Board regarding audit findings and corrective actions.
- Ensure proper investigation of all incident reports and ensure that appropriate action is taken and documented thoroughly.
- Monitor the Corporate Compliance Drop Box and ensure appropriate action is taken based upon any reports received related to potential problems, questionable practices, or known or suspected non-compliant activities or conduct by employees.
- Work with designated personnel regarding reference or background checks, as defined in policies.
- Recommend appropriate disciplinary action for employees who violate the compliance plan.
- Assist in the preparation of an annual budget for compliance activities DM. Implement plan based upon budget projections.
- Recommend compliance plan changes and improvements as warranted.

**Areas of Professional Focus:**

- Medical Necessity Reviews for Medicare and Commercial Payers to determine accuracy of payer pre-payment and post-payment reviews and to provide health care providers with guidance for clinical documentation requirements.

- Independent Review Organization – Lead on engagements for a wide variety of providers and organizations compelled to participate in Corporate Integrity Agreements (CIA) tied to coding and billing accuracy, arrangements, and Medical Necessity.
- Predictive Analytics and Modeling (proficient in trending and RAT Stats)
- Risk Assessment/Risk Management – Provides an array of services including Risk Based Internal Auditing (RBIA) and Risk Assessment Metrics (RAM) to assist hospitals and health systems in mitigating risk and developing corrective action plans.
- Regulatory Compliance (State and Federal) – Builds and implements compliance programs for health systems and hospitals as well as for physician groups to ensure compliance with all plans with which the organization participates.
- Provider Contract compliance – Guidance and assistance with payer contracts negotiations and applicability and enforcement of contract provisions.
- Serves as a third-party compliance officer / consultant for numerous hospitals, health systems and physician groups.
- Hospital Inpatient (IPPS) and Outpatient (OPPS) – Provide guidance and assistance to hospitals and health systems regarding claims processing and adjudication issues including routine services and/or items (PRM 2202.6, 2202.8, 2203) and stop loss claims and/or outlier claims.

**Expert Witness and Testimony Experience:**

- United States v. Pompy – Criminal Case No. 18-cr-20454 – charged with 22 counts of Distribution of Controlled Substances, Aiding and Abetting, in violation of 21 U.S.C. §841(a)(1) and 18 U.S.C. §2, and 15 counts of Health Care Fraud, Aiding and Abetting, in violation of 18 U.S.C. §1347 and 18 U.S.C. §2 (ECF No. 1)
- The State of Texas ex rel. Chastiny Thurmond (relator) v. Molina Healthcare, Inc. and Molina Healthcare of Texas, Inc Cause No. D-1-GV-13-000451 (Travis County, Texas, 53rd Judicial District, as of September 26, 2022 the case is under a protective order)
- United States of America v. Dr. David Lewis, et al, No:2.18-cr-20800 (Eastern District of Michigan Southern Division)
- United States vs. Brian James August, No.: 3.21-cr-00912-FM (Western District of Texas)
- United States of America v. Chesapeake ENT and Scott Saffold, MD, Civil Investigative Demand No 2019-5 (Eastern District of Virginia)
- HMSA (Blue Cross Blue Shield of Hawaii and Kristen Lindsay-Dudley – Nutrition Therapy Consultants Inc.). A Dispute Prevention & Resolution Inc (DPR NO. 20-0399) Arbitrator – Hon. Karl Sakamoto.
  - Circuit Court of the First Circuit State of Hawai`i has been filed (Civil No. 20-0001504) Nutrition Therapy Consultants, INC., Plaintiff vs. Hawaii Medical Services Association, a Hawaii non-profit Corporation
- Kristine Brecht, M.D. Settlement Hearing with Washington State Board of Medical Examiners; Case Number: M2019-94

- Centers for Medicare and Medicaid Services (Noridian) and NCA Holdings of Arizona, LLC (DBA New Promise Neuropathy Care Centers) and Dr. Ali H. Alavi; Honorable Robert Preston presiding
- United States of America v. Antonio Reyes-Vizcarrando, Indictment Criminal No. 19-481 (GAG), Violations: Title 18 United States Code § 1347, 1349, Forfeiture Title 18 United States Code § 982(a)(7), on behalf of Defendant ("Antonio Reyes-Vizcarrando")
- United States District Court for the District of New Jersey v. Morris Antebi; Case No. 20-MJ-4020
- Complete Medical Solutions, LLC (CMS) v Family Health Center, Inc (FHC) in matter of arbitration case number 01-18-0003-1682 in the Commercial Arbitration Tribunal for the American Arbitration Association; Mr. David Clark presiding
- The United States of America *ex rel* Judith Zissa, Plaintiffs v. Santa Barbara Country Alcohol, Drug and Mental Health Services; The County of Santa Barbara, Case No. SV14-06891-DMG (RZx) Pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 *ET SEQ*, Jury Trial
- North Carolina Medical Board; Coding and Documentation Auditor
- Demetric Fields, Plaintiff vs. McCormick and Schmick Restaurant Corp., Defendant; In the General Court of Justice Superior Court Division 17 CVS 005279, State of North Carolina
- South Peninsula Hospital, et al. v. Xerox State Healthcare, LLC, No. 3:15-cv-00177-TMB (D. Alaska)
- United States of America v. Chalifoux, No. 5:17-cr-00020 (N.D.W.V.)
- United States of America v. Richard Martin, No. 8:17-cr301T2YAAS (M.D. Fla.)
- United States of America v. Sheila Harris, No. 17-cr-00001-HG (D. Hawaii)
- United States of America v. Garrett Okubo, No. 17-cr-00572-JMS-01 (D. Hawaii)
- United States of America v. Dr. Jeffrey Campbell, No. 3:17-cr-00087 (W.D. Ky.)
- United States of America v. Dermatology Associates of Knoxville (DAK) – Eastern District of Tennessee
- Dermatology Associates of Knoxville, P.C., Plaintiffs, v. United States of America ex rel. And the State of Tennessee; Complaint for Declaratory Judgement and Motion to Quash Civil Investigative Demand, TCA 29-14-102
- Soft Landing Labs, LTD., v. Health Care Service Corporation, a Mutual Legal Reserve Company, d/b/a Blue Cross Blue Shield of Illinois, American Health Lawyers Association Dispute Resolution Service, Claim No. 4317
- Northside Hospital, Inc., v. Coventry Healthcare of Georgia, Inc., American Health Lawyers Association Dispute Resolution Service, Claim No. 3864
- Office of Professional Medical Conduct v. Joseph Pober, State of New York, OPMC Nos. CR-11-01-022tA, CR-12-01-0221A
- Medicare Administrative Law Judge Reviews, approximately 250 since 1998

**Certifications and Education:**

- Wharton Avery Institute of Executive Education, University of Pennsylvania – Executive Presence and Influence: Persuasive Leadership Development - 2022
- Certified in Healthcare Compliance (CHC) – Health Care Compliance Association (HCCA) - 2017
- Certified Evaluation & Management Auditor (CEMA) – National Alliance of Medical Auditing Specialist (NAMAS) - 2014
- Certified Medical Compliance Officer (CMCO) – Practice Management Institute and Liles Parker, LLC (PMI) - 2015
- Certified Professional Medical Auditor (CPMA) – American Academy of Professional Coders (AAPC) – 02/01/2013
- Certified Professional Coder (CPC) – American Academy of Professional Coders (AAPC) – 02/06/1999
- Certified Medical Practice Manager (CMPM) – DM University – 04/2014
- Certified Professional Coder-Payer (CPC-P) – American Academy of Professional Coders (AAPC) – 04/01/2006
- Certified Medical Office Manager (CMOM) – Practice Management Institute (PMI) –2004
- Certified Medical Insurance Specialist (CMIS) – Practice Management Institute (PMI) –2004
- Certified Medical Coder (CMC) – Practice Management Institute (PMI) – 2004
- Board of Advanced Medical Coding (BAMC) / Certified Compliance Professional- Physician, Advanced SCP) specialties included in certifications: Anesthesia, Cardiology, Evaluation and Management Auditing, Orthopedics, Pain Management, Psychiatry and Behavioral Health, Radiology, and Urology

**Podcasts:**
- The Compliance Guy (2021 – Current)

**Invited Lectures & Speaking Engagements (since 1997):**
- Invited on to multiple podcasts for interviews (Not Elsewhere Classifiable, ForbesBooks Podcast, NSCHBC – The Edge, Pain the Medical Picture, Urology Podcast with John C Lin, MD) 2021-Current
- Administrator Support Community for ENT (ASCENT)
- American Psychiatric Association (APA)
- The American Academy of Family Practitioners (AAFP)
- The American Academy of Professional Coders (AAPC)
- The National Alliance of Medical Auditing Specialists (NAMAS)
- The American Alliance of Orthopedic Executives (AAOE)
- The American College of Cardiology (ACC)
- The American College of Rheumatology (ACR)
- The American Dermatologic Association of Managers (ADAM)

- The American Health Law Association (AHLA)
- The American Medical Billing Association (AMBA)
- The American Otolaryngology Association (AOA)
- The American Urological Association (AUA)
- The Georgia Association of Orthopedic Executives (GAOE)
- The Medical Group Management Association (MGMA)
- The National Organization of Rheumatology Managers (NORM)
- The Nurse Practitioner Association of New York (The NPA)
- The National Society of Certified Healthcare Business Consultants (NSCHBC)
- The OrthoForum Shareholder's Meeting
- Practice Management Institute (PMI)
- The State of Hawaii Professional Coders Association (HPCA)
- The State of Kentucky Medical Group Management Association
- Columbia University
- Brigham Women and Children's
- Jansen Pharmaceuticals on behalf of the Dayton, Ohio Psychiatric Association (Division of Psychiatric Pharma)
- Miami Dade University Graduating Class
- Monitor Monday (Audit Report with Sean M. Weiss) 2019 – 2020
- OrthoVirginia Shareholder Meeting

**Presentations (Since 2020)**
- "When the OIG Comes Knocking, Will Your Practice Survive?" and "Payor Changes That Affect Your Bottom Line." California Orthopaedic Association (COA) – Apr 2020
- "OIG and Orthopedic Audit Risks in 2020." American Alliance of Orthopaedic Executives (AAOE) – May 2020
- "Staff Efficiency and Maximizing Office Flow" (Joint presentation with Jesse Overbay of DoctorsManagement) and "Utilizing APPs and Scribes in Your Practice." American Urological Association (AUA) – May 2020
- "Standard of Conduct, Non-Retaliation and Corrective Action Plan." Joint session with Amanda Waesch of Brennan Manna and Diamond. National Alliance of Medical Auditing Specialists (NAMAS) Webinar – Aug 2020
- "OIG Self Disclosure." Joint session with Frank Cohen and Stephanie Allard of DoctorsManagement. NAMAS Webinar – Sept 2020
- "Compliance and Medical Necessity: How to Cover Your Assets." Michigan Medical Billers Association (MMBA) – Sept 2020
- "A Nightmare in Rheumatology 2020/2021 'Escape and Evade.'" National Organization of Rheumatology Managers (NORM) – Sept 2020
- "Structuring a Corporate Compliance Program to Comply with DOJ Criminal Division Guidance." Administrator Support Community for ENT (ASCENT) – Oct 2020

- "Creating a Winning Appeal." NAMAS Webinar – Oct 2020
- "Current Auditor Action and How to Mitigate Risks." RACMonitor Webinar – Nov 2020
- "Keynote Address: A New Way of Practice Management for 2021 and Beyond" , "That Was Then, This is Now: New Patient Visit in 2021" and "The New Era of Coding for the Established Patient." American College of Rheumatology (ACR) – Nov 2020
- "Conducting an Effective GAP Analysis: The ABCs of the Process." NAMAS Webinar – Nov 2020
- "Creating a Winning Appeal." Tennessee Medical Association (TMA) Symposium – Nov 2020
- "When to Disclose and When to Refund." Joint session with Amanda Waesch of Brennan Manna and Diamond. NAMAS – Dec 2020
- "Government Pitfalls and Mitigating Risks 'OIG and OCR High Risk Targets'." The National Society of Certified Healthcare Business Consultants (NSCHBC) Winter Workshop – Jan 2021
- "What is Compliance?" NORM Education Committee (NEC) Year of Compliance Webinar – Jan 2021
- "Comparative Billing Reports: Analyzing and Responding to 'A Push by Payers to Make You Conform'." Joint session with Frank Cohen of DoctorsManagement, NAMAS Webinar – Feb 2021
- "TPE RAC Audit and Appeals." Joint session with Robert Liles of Liles Parker, RACMonitor Webinar – Mar 2021
- "Stand Your Ground With Payers." Practice Management Institute (PMI) Webinar – Apr 2021
- "Escalation Policies: What are They and What is Their Purpose?" NAMAS Webinar – May 2021
- "E&M Audit Vulnerability: Know Your Best Defense" and "2021 Incident-to: The Ins and Outs of These Problematic Services." NAMAS Virtual Conference – May 2021
- "Government Pitfalls and Mitigating Risks 'CMS, HHS and OIG High Risk Targets'." COA Virtual Conference – May 2021
- "Comparative Billing Reports (CBRs), CMS/OIG and Commercial Payors." Joint presentation with Frank Cohen of DoctorsManagement, NEC Year of Compliance Webinar – May 2021
- "Leveling the Playing Field – Audits, Appeals, Compliance and Medical Necessity." AUA 2021 Practice Management Program – May 2021
- "Self Disclosure vs. Voluntary Refund." Joint Presentation with Stephanie Allard of DoctorsManagement. NEC Year of Compliance Webinar – Aug 2021
- "Compliance Risks for Urgent Cares." NSCHBC Webinar – Sept 2021
- "Compliance Bootcamp." ASCENT Annual Conference – Oct 2021
- "Leveling the Playing Field: Medical Necessity & Appeals." ASCENT Annual Conference – Oct 2021
- "Stand Your Ground With Payors." American Medical Billing Association (AMBA) National Medical Billing & Coding Conference – Oct 2021
- "Building and Scaling an Effective Compliance Program Using DOJ Guidance: 'Evaluation of Corporate Compliance Programs'." Joint presentation with Paul Spencer, DoctorsManagement. NAMAS Webinar – Oct 2021

- "2021 DOJ Update for Evaluation of Corporate Compliance Programs." AAOE Annual Conference – Nov 2021
- "Audit Risks Comping Out of a Public Health Emergency (PHE)." TMA Symposium – Nov 2021
- "Business of Rheum: Avoiding the 2021 Audit Pitfalls." ACR Practice Management Virtual Conference – Nov 2021
- Several presentation sessions at NAMAS Annual Conference – Dec 2021
- "Audit Risks Coming out of a Public Health Emergency (PHE)." The National Society of Certified Healthcare Business Consultants (NSCHBC) Winter Workshop – Jan 2022
- "2022 OIG Risk Areas" ASCENT Webinar – Feb 2022
- "Telehealth – Or Is It?" NSCHBC Telehealth Summit – Feb 2022
- "Building an Effective Risk-Based Audit Plan" HCCA Annual Conference – Mar 2022
- "The CARES Act – A Breakdown of Risk Areas for Orthopedics Entering an Endemic" Joint presentation with Amanda Waesch, Brennan Manna Diamond (BMD). California Orthopedic Association (COA) – Apr 2022
- "Stand Your Ground With Payors" The American Academy of Professional Coders (AAPC) Columbus, GA Chapter Webinar – Apr 2022
- "Compliance Bootcamp" ACR Education Exchange – Apr 2022
- "Stand Your Ground With Payors" AAOE Annual Conference – Apr 2022
- "The Best of the Best – What Effective Managers Do to Sustain Success" AAPC Columbus, GA Chapter, May Mania – May 2022
- "MAC, RAC, SIU, TPE & CERT Audits: How to Prepare by Using CBRs" NAMAS Webinar – May 2022
- "Can You See Me Now?" & "Is There Really Such Thing as Payor Prejudice Toward a Provider?" NAMAS Virtual Conference – May 2022
- "CMS Administrative Appeals Process" Training Leader Webinar – May 2022
- "Stand Your Ground With Payors" AAPC West Palm Beach Chapter, May Mania – May 2022
- "CMS Administrative Process: Navigating the Complex World of Denials and Appeals" OncoSpark OrthoCare Summit – July 2022
- "Best of the Best: What Effective Managers Do to Sustain Success", "Leveling the Playing Field: Stand Your Ground With Payors" & "Government and Regulatory Update" AUA Practice Management & Coding Program – July 2022
- "CMS Administrative Process: Navigating the Complex World of Denials and Appeals" – ASCENT Webinar – Aug 2022
- "Stand Your Ground With Payors" Colorado MGMA – Sept 2022
- "Stand Your Ground With Payors" ASCENT – Sept 2022
- "Introduction to Medical Coding for Payment Lawyers – Resolving Coding Disputes" American Health Law Association (AHLA) Fraud and Compliance Forum – Sept 2022
- "Tales From the Trenches" DM Panel BMD Healthcare Innovation Summit – Oct 2022

- Key note address "Stand Your Ground with Payers" and "CMS Administration Appeals" AMBA Conference – Oct 2022
- "Split the Time: CMS Split-Shared Services", "Does Your Resume Tell Your Best Story (with Scott Kraft)", and "Audit Escalation: When Peer Review Should be Considered." NAMAS Conference – Dec 2022

**Board Affiliation, Steering Committees and Task Force:**
- DoctorsManagement Board of Directors (2015 - Current)
- OncoSpark Advisory Board (2021 – Current)
- American Alliance of Orthopedic Executives (AAOE) Industry Relations Advisory Board; Chairman, Indianapolis (2016-2017, 2022-2023)
- Editorial Board for VBP Monitor, Minnesota (2015 – Current)
- Editorial Board for BC-Advantage; Nevada & South Carolina (2003 – Current)
- Columbia/HCA Steering Committee; Tennessee (1999 – 2001)
- Georgia Bone and Joint Compliance Committee; Georgia (2018 – 2022)
- Cardiovascular Medicine Institute; Maryland (CVI) Compliance Committee (Current)
- Ortho Florida and IHBS Compliance Committee; Tampa (2018 – Current)
- Inova Compliance Steering Committee; Virginia (2018 – 2020)
- Articularis Health Group Steering Committee; South Carolina (2019 – Current)
- AHLA Online Dispute Resolution for Medical Bills task force (2022 – Current)

**Honors and Awards:**

- Award for Excellence in Service Journalism, United Communications Group, 2009 – DecisionHealth White Paper "7 Myths About Physician Fees"
- The Jim Altizer Memorial Award (The Medical Management Institute), 2002. Award for demonstrating the highest standards of ethical and moral character.

**Published In (since 1996):**

- TheComplianceGuyBlog.com
- Renal and Urology News
- Urology Practice Management
- RAC Monitor
- Medical Economics
- Part B News
- BC Advantage
- The Coding Edge
- MGMA Connections
- Kareo Newsletter

**Published Articles / Author or Co-Author (since 1996):**

1. Medicare Rules and Regulations – Co-author – The Medical Management Institute; 1996, 1997, 1998, 2001, 2002, 2003
2. Coding for Optimal Reimbursement – Co-author – The Medical Management Institute; 1996, 1997, 1998, 2001, 2002, 2003
3. Conducting Chart Audits – Co-author – The Medical Management Institute; 2001, 2002, 2003
4. The Health Insurance Portability and Accountability Act – Co-author – The Medical Management Institute; 1997
5. A Guide to Negotiating Managed Care Contracts – Author – The CMC Group; 2004
6. Kulhan, Storm, editor, BC-Advantage "Men on a Mission." BC Advantage, June/July 2011.
7. Sean Weiss. "The Time for Change is Now Things Will Only Get Worse." BC Advantage, Aug./Sept. 2011.
8. Sean Weiss. "How to Perform a Practice Compliance Audit Tips and Strategies from the Inside." BC Advantage, Apr./May 2012.
9. Sean Weiss. "Accounting and Finance for Non-Financial Managers Build a Solid Practice in 2012." BC Advantage, June/July 2012.
10. Sean Weiss. "Interview With Secretary of Health and Human Services (HHS) Kathleen Sebelius." BC Advantage, Oct./Nov. 2012.
11. Sean Weiss. "Understanding Healthcare from a Politician's Perspective (Newt Gingrich)." BC Advantage, Dec./Jan. 2012.
12. T. Blake King and Sean M. Weiss. "How to Value Your Practice." BC Advantage, Mar./Apr. 2013.
13. Sean Weiss. "Unrelenting CMS and Private Payer CBR Inundation of Physician Practice." The Business of Medicine, July 8, 2015.
14. Sean Weiss. "Effective Leadership in Healthcare." NAMAS, June 8, 2016.
15. Sean Weiss. "What Happened to Healthcare." The Business of Medicine, June 10, 2016.
16. Sean Weiss. "Dealing with Difficult Providers." NAMAS, June 28, 2016.
17. Sean Weiss. "Responding to "The Letter"." NAMAS, July 19, 2016.
18. Sean Weiss. "When the Government Tries to Change the Rules." NAMAS, July 29, 2016.
19. Sean Weiss. "I'm Just a Cowboy Not Really But." NAMAS Monthly Compliance Article, Sept. 27, 2016.
20. Sean Weiss. "Compliance Plans The Truth About Templates." NAMAS, Sept. 28, 2016.
21. Sean Weiss. "The World of Healthcare…" BC Advantage, Sept. 29, 2016.
22. Sean Weiss. "E&M Audits and Appeals." NAMAS Monthly Compliance Article, Nov. 8, 2016.
23. Sean Weiss. "To Disclose or Not to Disclose… That is the Question!" BC Advantage, Dec. 22, 2016.
24. Sean Weiss. "AKS Update." NAMAS Monthly Compliance Article, Jan. 3, 2017.
25. Sean Weiss. "The Truth About ZPICs." BC Advantage, May 30, 2017.
26. Sean Weiss. "DOJ Mid-Year Update." Business of Medicine, June 28, 2017.

27. Sean Weiss. "Changes to the Medicare Appeals Process." BC Advantage, Aug. 8, 2017.
28. Sean Weiss. "Berenson-Eggers Type of Service Codes." Urology Today, Aug. 10, 2017.
29. Sean Weiss. "Who Can it Be Knocking at Your Door Are You Prepared." NAMAS Monthly Compliance Article, Aug. 17, 2017.
30. Sean Weiss. "Employees of the Future in Healthcare Managing Millennials and Generation Z." BC Advantage, Aug. 23, 2017.
31. Sean Weiss. "Challenging Medical Necessity and Auditor's Requisite Skills." Business of Medicine, Aug. 25, 2017.
32. Sean Weiss. "Fear Factor The Unethical Business of Medicine." Greenbranch Publishing, Nov. 13, 2017.
33. Sean Weiss. "Creating a Culture of Compliance in 2018." BC Advantage, Jan. 9, 2018.
34. Sean Weiss. "Templates for Documenting Services." BC Advantage, Jan. 11, 2018.
35. Sean Weiss. "Be Good to Yourself So You Can Be Good For Others." BC Advantage, Feb. 27, 2018.
36. Sean Weiss. "Attestation and Notice of Failure to Comply." NAMAS, Mar. 1, 2018.
37. Sean Weiss. "Structuring a Mission Statement." NAMAS, Mar. 1, 2018.
38. Sean Weiss. "Waiver of Copay and Deductible." NAMAS, Mar. 5, 2018.
39. Sean Weiss. "Financial Remedies Language for Employment Agreement." NAMAS, Apr. 4, 2018.
40. Sean Weiss. "Legibility and the Crackdown by Payors." NAMAS, May 31, 2018.
41. Sean Weiss. "Target, Probe, and Educate." NAMAS, 27 June 27, 2018.
42. Sean Weiss. "Defending Evaluation and Management Services." AOA36 Conference, Aug. 12, 2018.
43. Lisa Eramo "How 'virtual' scribes can reduce HER headaches" Medical Economics Journal, Jan 2022, Volume 99, Issue 1
44. Sean Weiss "Medical Necessity in 2022." National Alliance of Medical Auditing Specialists Audit Tip for January 10, 2022.

Expert Report of Sean M. Weiss



Expert Report of

Sean M. Weiss, CHC, CEMA, CMCO, CPMA, CPC-P, CPC, CMC, CMIS, CMOM

*March 21, 2023*

Expert Report of Sean M. Weiss

## Contents

Assignment ............................................................................................................................. 1

Qualifications ......................................................................................................................... 3

Documents and Information Considered .............................................................................. 6

Independent Objective Third-party Audit ........................................................................... 6

Conclusion ............................................................................................................................. 8

Exhibit 1 - Works Cited ......................................................................................................... 9

Exhibit 2 - Curriculum Vitae of Sean M. Weiss .................................................................. 10

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 40

Expert Report of Sean M. Weiss

## Assignment

1. I, Sean M. Weiss, have been retained by Chapman Law Group located at 1441 West Long Lake Rd., Suite 310, Troy, MI 48098, to opine in the matter of United States v. Loey Kousa, M.D. who practiced at a clinic he owned called East KY Clinic, PLLC ("East KY Clinic"), located at 538 Main Street, Paintsville, KY 41240: Indictment No. 7:22cr-008-REW. It shall be known that I am not rendering any legal or medical opinions in this matter. I am a Regulatory Compliance, Auditing and Coding/Documentation with more than 25-years of experience, and as such will only opine on those specific disputed issues on which I am qualified as a subject matter expert (SME).

2. I understand, as described in the indictment there are 9 total counts (counts 1 - 5 Distribution of a Controlled Substance, Counts 6 & 7 Healthcare Fraud, and counts 8 & 9 False Statements Relating to Healthcare Matters) whereby the government is alleging Healthcare Fraud (scheme and/or artifice) tied to the billing and payment of Evaluation and Management Services, and other medical services (e.g., electrocardiograms) as will be discussed throughout my report.

   a) It is critical that those using this report keep in mind I am unable to speculate on events based on patient interviews provided, or allegations of wrongdoing made by patients against Dr. Kousa.

   b) My sole focus as an expert in this case is to review the provider's documentation for the cases in question and to determine whether based on what is documented in those medical records if the claims for reimbursement submitted by Dr. Kousa substantiated the level of service billed through determining the medical appropriateness, necessity, and reasonableness from a billing, coding, and documentation standpoint, identical to how it would be performed by any non-clinical auditor/investigator at CMS and/or another government agency.

   c) To save the time of the Court that will hear arguments in this case, I will state my expert opinion(s) upfront and then utilize the rest of this Expert Report of Findings to support my findings with public documents from authoritative sources (i.e., CMS, AMA, Industry Experts, and my own extensive experience of working in this). Indeed, many of the findings I will present are supported based on CMS' own words, published in their own documents on their website, and in their publicly accessible provider portal.

   d) In my more than 25 years of working in auditing, billing, coding, and regulatory compliance, I have had various opportunities to evaluate cases brought before me by plaintiffs and

Expert Report of Sean M. Weiss

defendants. Even if I refused the cases for one reason or another, I always perform an in-depth and outside the box thinking review. I pride myself on objectivity and independence to avoid appearing biased or rendering a decision based on compensation for my time.

3. My expert opinions are forged from experience in working on highly complex matters often having permanent, life-altering impact on the accused. As such, it is my responsibility to ensure no stone is left unturned nor am I ignoring one of the thousands of convoluted and always changing rules, guidelines or policies put forth by a payor. It is also critical to wait until all relevant facts submitted are reviewed, impartial interviews conducted, and authoritative documentation is taken into consideration before rendering an actual opinion. All which has been done in this matter.

4. In review of the individual dates of service in question provided to me by counsel, the documentation all appears to be captured via an Electronic Medical Record (EMR). This makes the process of evaluating the Subjective, Objective, Assessment and Plan aspects of the encounter much easier since there is a good cadence to the records. The medical necessity for the E/M services and other ancillary service(s) are clearly detectable based on captured information in the progress note(s).

5. As part of Dr. Kousa's case, medical records for treatment were reviewed for the following patients of Dr. Kousa:

   - L▓ G▓▓, DOB 6/3/1986; and
   - Michael Smith, DOB 4/10/1971.

6. Dates of service for these patients ranged from January, 2016 through February, 2022. Again, we strictly looked at the documentation for services, and whether these services were medically appropriate, necessary, and reasonable based on the stated presentations of the two patients.

7. In reviewing the medical records for these patients, which included all encounters, plans of care, orders for testing, prescription medications and instructions issues to the patients involved, I come to the following determinations:

   - Services, as documented, point to ongoing medical care for these two patients for chronic conditions either reported by the patients themselves, or detected by laboratory, or other testing.
   - Laboratory testing for chronic conditions was ongoing and was specifically ordered based on the presenting problems of the patients.

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 42

Expert Report of Sean M. Weiss

- Additional orders for medical testing, and the resulting testing stemming from these orders were found to be consistent with generally accepted standards of medical practice.

- Drug testing was performed for these two patients with regard to assessing the therapeutic levels of Schedule II and Schedule IV properly prescribed to the patients. This was performed in a manner consistent with generally accepted standards of medical practice.

- Of note, the Controlled Drug Prescription Contract for Mr. Smith, which was dated 4/23/2021, was signed by the physician, but was not signed by the patient. Given the specifics of this particular patient, this may be a deliberate omission on behalf of the patient.

- While there are brief clinical summaries that have been prepared for specific dates of service for each patient, the provider would benefit from preparing a comprehensive clinical summary that covers all treatment and dates of service for both patients that describes the treatment provided and provides additional insight into the medical decision-making for each patient.
  - In the case of the notes for Mr. G████, this would be preferable to the current handwritten notes that were applied to copies of the medical records.

## Qualifications

1. I am a Partner and Vice President of Compliance for DoctorsManagement, LLC (DoctorsManagement), based in Knoxville, Tennessee. DoctorsManagement is a medical and health care consulting firm that works with physicians in a varied array of health care, dental and medical practice management services.

2. DoctorsManagement is an independent third-party firm with a heavy concentration on medical auditing and regulatory compliance, with more than 60 years of auditing multi-specialty procedures and services. DoctorsManagement services more than 30,000 providers across the country and performs more than one million medical documentation claim reviews annually on behalf of physician groups, community hospitals, university medical groups, ambulatory surgery

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 43

Expert Report of Sean M. Weiss

centers and integrated delivery health systems in response to payer and their contractors' audits where demand for refunds have been made.

3. My professional experience in the field of regulatory compliance/health law spans more than 25 years. This specifically includes experience in the fields of billing, coding, compliance, and documentation. I hold certifications in coding and auditing from the American Academy of Professional Coders both on the physician and payer side (Certified Professional Medical Auditor (CPMA), Certified Professional Coder – Payer (CPC-P) and Certified Professional Coder (CPC)), in addition to being Certified in Healthcare Compliance (CHC) from the Healthcare Compliance Association (HCCA). I am a Certified Medical Compliance Officer (CMCO) through Practice Management Institute and Liles Parker, PLLC. I hold the Certified Medical Coder (CMC), The Certified Medical Insurance Specialist (CMIS) and the Certified Medical Office Manager (CMOM) through the Practice Management Institute.

4. I also hold a Certification in Evaluation and Management Services (CEMA) from The National Alliance of Medical Auditing Specialists (NAMAS).

5. During my more than 25 years of working in the healthcare industry, I have provided training and educational programs on the topics of auditing medical claims, medical coding, appealing denied claims, regulatory compliance issues, risk management, and practice management strategies to physicians and their support staff, medical billers, coders, auditors, compliance officers, attorneys, employees of governmental agencies (including the Centers for Medicare and Medicaid Services, the HHS Office of Inspector General, the Department of Justice, Recovery Audit Contractors and Zone Program Integrity Contractors), employees of commercial insurance companies (Humana, Blue Cross Blue Shield, Aetna, CIGNA and United Healthcare) in addition to members of their Special Investigative Units. I have been a presenter and instructor for various professional organizations (American Academy of Professional Coders, National Organization of Rheumatology Managers, Medical Group Management Association, American Alliance of Orthopedic Executives, Practice Management Institute and The National Alliance of Medical Auditing Specialists), and Medical Societies (American Urological Association, The Nurse Practitioner Association, American Otolaryngology Association, American College of Cardiology, BONES/American Association of Orthopedic Surgeons, American Dermatology Association, Ohio Psychiatric Association, and the American College of Rheumatology).

6. My past employment and current employment for which I have served in various capacities includes Columbia/HCA – Senior Consultant/HIMS, Tenet Health System – Senior

Expert Report of Sean M. Weiss

Analyst/Compliance Officer Southeastern Region Central Billing Office providing analysis of claims denials and developing appeal strategies, Adventist Health System - Interim Director of Coding with a department of more than 140 billers and coders; coding and billing for more than 2,200 providers of medical care in 10 states, Inova Health System – Interim Senior Director of Revenue Integrity providing coding and appeal guidance to more than 150 billers and coders providing billing and coding services for more than 1,400 providers of medical care. All previous employers required the submission of claims to the Centers for Medicare and Medicaid Services in addition to Commercial Payers, Workers Compensation, The Veterans Administration, TRICARE, and patients' secondary insurance plans.

7. I have been published in numerous industry journals including *Billing and Coding Advantage* with a subscription universe of more than 100,000 readers, the *News on Rheumatology Matters* newsletter and *The ENT Voice* newsletter. I also maintain my own compliance podcast (www.thecomplianceguy.com).

8. I have rendered subject matter expert opinions to members of the Office of Inspector General, Prosecutors involved in Qui Tam cases in addition to False Claims Act cases.

9. I render a variety of professional consultative services to provider medical groups, community hospitals and integrated delivery health systems. My clients tend to range in size from solo providers all the way up to 2,200 provider groups. Services include coding and billing audits, medical necessity reviews, revenue cycle management reviews, building of corporate compliance programs including Office of Inspector General Compliance, serving as a third-party compliance consultant and advisory board member, guidance on appealing denied claims or demands for refunds following audits by governmental and commercial payers.

10. I am or have been contracted to more than 25 law firms across the United States to serve as an expert witness in federal and state cases (Criminal and Civil) as well as in Mediation and Arbitration cases before the American Health Lawyers Association Dispute Resolutions Services.

11. Additional information relating to my background and professional experience is set forth in my *curriculum vitae*, a copy of which is attached as Exhibit 2.

12. My expert testimony and opinions have been accepted by Federal and State courts, as well as by Peer Review Organizations, including: *Northside Hospital, Inc., v. Coventry Healthcare of Georgia, Inc.*, before The American Health Lawyers Association Dispute Resolution Service, Claim No. 3864 regarding failure to process clean claims in accordance with Medicare guidelines and federal and state laws; *United States of America v. Richard David Martin*, No. 8:17-cr301T2YAAS

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 45

Expert Report of Sean M. Weiss

(M.D. Fla.) regarding claims the individual violated the Anti-kickback statute and False Claims Act; *United States of America v. Chalifoux*, No. 5:17-cr-00020 (N.D.W.V.) regarding violation of the False Claims Act.

13. Since 2006, I have also participated as an expert witness in approximately 250 Medicare Administrative Law Judge Reviews related to Coding and Documentational issues as well as "Medical Necessity" disputes, including, for example: *Office of Professional Medical Conduct v. Joseph Pober*, OPMC 1#: CR-1I-O1-022tA, OPMC#: CR-12-01-0221A (State of New York) whereby the provider was accused of violating (Current Procedural Terminology (CPT) and Medicare coding guidelines; *Soft Landing Labs, LTD v. Health Care Service Corporation, a Mutual Legal Reserve Company, d/b/a Blue Cross Blue Shield of Illinois* regarding the payers failure to process clean claims submitted for payment of laboratory services; and *In The American Health Lawyers Association Dispute Resolution Service*, Claim No. 4317.

14. I have provided expert guidance and interpretation in CPT, International Classification of Disease (ICD) and Clinical Documentation Guidelines in Florida, Pennsylvania, and New Jersey at the request of the Office of Inspector General, Department of Justice and Centers for Medicare and Medicaid Services to assist in providing interpretation to rules or guidance issued that was unclear to the professionals working cases within these entities.

## Documents and Information Considered

1. In the course of my analysis and in forming the opinions set forth in this Report, I have reviewed and considered various documents that were produced by counsel as well as other relevant material. A complete listing of the relevant material I considered is attached as <u>Exhibit 1</u>.

2. I have also relied upon my training, education, and my applied professional experience. I reserve the right to update my opinions if new relevant information becomes available

## Independent Objective Third-party Audit

Our dual certified Senior Compliance Auditor reviewed the examples of E/M services performed by Dr. Kousa, which I then personally reviewed. The review consisted of documentation submitted to our firm by Dr. Kousa's counsel.

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 46

Expert Report of Sean M. Weiss

At the time these services were rendered, the selection of a CPT code was based on the documentation of History of Present Illness, Examination, and Medical Decision Making. The reporting of these services with E/M CPT codes was consistent with the services rendered.

DoctorsManagement was additionally asked to opine on the medical necessity of EKGs (CPT code 93000) and Holter monitoring (CPT code 93224) provided to the following patient:

- L█ G█ DOB 6/3/1986.

**EKGS**

A total of 29 EKGs, performed between the dates of 7/21/2016 thru 2/14/2022. The following audit findings related to these EKGs are noted:

- 28 of 29 of the EKGs included an order for the EKG as part of encounter documentation. The only exception to this was the encounter from 9/4/2019;
- All of the encounters from which an EKG was ordered included a diagnostic indication for the EKG as part of the assessment of the patient included in the encounter documentation;
- Upon reviewing the 29 tracings for the EKGs performed, The following documented findings were identified (NOTE: In every case, these findings were labeled "unconfirmed" on the tracing itself):
  - 20 EKGs had a documented rhythm abnormality of some type;
  - 5 EKGs indicated a lone finding of "normal sinus rhythm";
  - 1 EKG from 1/19/2018 indicated that the patient has a cardiac rhythm controlled by a pacemaker. It is worth noting that there is no mention of a pacemaker in any of the encounter documentation submitted for review;
  - In the remaining three cases, the EKG had apparently been removed from the patient at the conclusion of the tracing. In these cases, no interpretation of the tracing was documented.

**Holter Monitoring**

Our independent, impartial, third-party review found both an order and review of a Holter monitor for this patient. It is notable that both the order and review of the Holter monitor occurred on 9/30/2019, which, given that the Holter monitor is a device for recording cardiac events over a 24-hour period, raises questions.

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 47

Expert Report of Sean M. Weiss

## Conclusion

Taking into consideration all of the information provided for this review up to this point, it is the opinion of this regulatory compliance expert that the billing practices do not reflect evidence of fraud. Our firm has determined that the levels of E/M service were indeed supported as were the ancillary tests.

While it may be possible to quibble over the exact code chosen for each patient on every visit, there is seemingly no dispute that services were rendered based on the submitted and reviewed documentation. The only question there may be, which is easily quashed by this expert, is whether or not the most accurate level of service was always selected by Dr. Kousa. Again, for the reasons outlined in this report, this is a highly subjective process. Ultimately, simple mistakes or differences in opinion regarding the appropriate code to be applied based on confusing and continuously evolving guidelines for E/M Services do not rise to the level of fraud or fraudulent intent.

Additionally, it should be noted that in 2021 just as the government points out in their grand jury indictment previously mentioned, The American Medical Association, in conjunction with CMS, adopted new E/M Guidelines for the outpatient setting / physician's office setting that totally eliminated the old way of determining a level of service. This new guidance completely removed the requirements of capturing history and examination elements for billing purposes and replaced it with a more simplistic approach to eliminate the confusion that has existed dating to 1995. Now providers are only required to document either a medically appropriate history or examination in order to support their billing. What constitutes a medically appropriate history or examination is still an open question since neither the AMA nor CMS has clearly defined this. Regardless, billing for E/M Services are now based entirely on either the complexity of the medical decision-making or the total time for that date of service engaged in the overall care of the patient.

In 2023, new E/M Guidelines were adopted for the inpatient setting and they also mirror the standards put into effect for the outpatient setting adopted in 2021.

As noted above, I reserve the right to amend this report if or when additional information is supplied.

Dated March 21, 2023

Sean M. Weiss

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 48

Expert Report of Sean M. Weiss

## Exhibit 1 - Works Cited

a. Medical records for patients

b. Government Indictment

c. American Medical Association Current Procedural Manual for years in question

d. Centers for Medicare and Medicaid Services Internet Only Manual and Program Integrity Manual on Evaluation and Management Services

e. Coding and Documentation Requirements – CMS

f. U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration (SAMHSA).

g. 18 U.S.C. §1349

h. Section 1862 (a)(1)(A) of the Social Security Act (the Act)

i. Section 3.2.3.7 – Chapter 3 of the Medicare Program Integrity Manual

j. Chapter 3 of the Medicare Program Integrity Manual – 3.4.1.3 – Diagnosis Code Requirements (Rev. 10365; Issued: 10-02-20; Effective: 08-27-20; Implementation: 08-27-20) 'Section 1833(e)

k. Chapter 12 of the Benefit Claims Manual, Section 30.6.1

l. 42 Code of Federal Regulations (CFR) §424.5(a)(6)

m. Title XVIII of the Social Security Act, Section 1862 (a) (1) (a)

n. AMA CPT® years for the claims in question

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 49

Expert Report of Sean M. Weiss

## Exhibit 2 - Curriculum Vitae of Sean M. Weiss

**Sean M. Weiss**

**CHC, CEMA, CMCO, CPMA, CPC-P, CPC, CMC, CMIS, CMOM**

**Professional Experience:**

- DoctorsManagement, LLC, Knoxville, TN – Partner and Vice President of Compliance, Dec. 2012 to present – The below are organizations under contract to DoctorsManagement for whom I serve as the Compliance Officer or in another Senior Capacity:
  - Investigator / Reviewer for the State of North Carolina Medical Board – 2021 - Current
  - Articularis Health Group (AHG), Charleston, South Carolina – Chief Compliance Officer, 2019 – Current
  - OrthoFlorida / IHBS, Tampa, FL – Chief Compliance Officer, 2019 – Current
  - Boston Neuro Behavioral Associates, Boston, Massachusetts – Compliance Officer, 2020 – Current
  - Athens Orthopedic Clinic (AOC), Athens, Georgia – Compliance Consultant to Chief Compliance Officer, 2017 – Current
  - Georgia Bone and Joint, Newnan, Georgia – Compliance Officer – 2018 – Current
  - Array Skin Therapy (AST), Orange County, California – Compliance Officer – 2018 – Current
  - Chicago IVF – Chicago, Illinois – Compliance Officer – 2018 – Current
  - PJ Therapy, Elberton, Georgia – Compliance Officer – 2019 – Current
  - Adventist Health System, Orlando, FL – Interim Director of Coding, 2014 to 2016
  - Inova Health System, Fairfax, VA – Senior Director of Revenue Integrity, 2018 and 2019
- DecisionHealth, LLC, Gaithersburg, MD – Vice President/Chief Compliance Officer, Jan. 2008 to Nov. 2012
- The CMC Group, LLC, Atlanta, GA – Senior Partner and Chief Compliance Officer, July 2003 to Dec. 2007
- Columbia/HCA, Brentwood, TN – Physician Consultant, 1999 to 2001
- Tenet Health System (Tenet Physician Services of the Southeast), Atlanta, GA – Senior Analyst & Compliance Officer (1998-1999)
- The Medical Management Institute, Alpharetta, GA – Director of Consulting and Senior Management Consultant, 1996-1998, 2001-2003

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 50

Expert Report of Sean M. Weiss

**Compliance Officer Responsibilities:**

- Consistently meet compliance plan goals and objectives, as defined and agreed to by the Board and Senior Management Team.
- Assist with the development, management, coordination, and continual improvement of the compliance plan.  Ensure the effectiveness of compliance efforts.  Work to promote corporate compliance with all applicable laws, regulations, rules, and policies and procedures of governmental authorities and payers.
- Assure that the compliance plan is reviewed and updated at least annually.
- Lead the corporate compliance plan development process. Work with administration for furthering plan development.
- Develop, review and maintain all compliance policies, procedures, standards of conduct, and employee compliance handbooks.
- Monitor program effectiveness and recommend and make appropriate modifications.
- Interact with government officials, third party payers, and legal and consulting counsel regarding compliance issues, including plan development, audits, investigations, and other activities.
- Oversee ongoing training and education of physicians and employees, regarding billing, coding, and other issues subject to the compliance plan, upon hire and at regular intervals.  Maintain current records and documentation related to employee training and other compliance-related activities.
- Identify areas of potential high risk (as related to compliance issues), monitor those areas, and make recommendations and/or take corrective actions.
- Supervise audits performed by internal personnel and external firms.  Review audit findings.  Report to the Board regarding audit findings and corrective actions.
- Ensure proper investigation of all incident reports and ensure that appropriate action is taken and documented thoroughly.
- Monitor the Corporate Compliance Drop Box and ensure appropriate action is taken based upon any reports received related to potential problems, questionable practices, or known or suspected non-compliant activities or conduct by employees.
- Work with designated personnel regarding reference or background checks, as defined in policies.

Expert Report of Sean M. Weiss

- Recommend appropriate disciplinary action for employees who violate the compliance plan.
- Assist in the preparation of an annual budget for compliance activities DM. Implement plan based upon budget projections.
- Recommend compliance plan changes and improvements as warranted.

**Areas of Professional Focus:**

- Medical Necessity Reviews for Medicare and Commercial Payers to determine accuracy of payer pre-payment and post-payment reviews and to provide health care providers with guidance for clinical documentation requirements.
- Independent Review Organization – Lead on engagements for a wide variety of providers and organizations compelled to participate in Corporate Integrity Agreements (CIA) tied to coding and billing accuracy, arrangements, and Medical Necessity.
- Predictive Analytics and Modeling (proficient in trending and RAT Stats)
- Risk Assessment/Risk Management – Provides an array of services including Risk Based Internal Auditing (RBIA) and Risk Assessment Metrics (RAM) to assist hospitals and health systems in mitigating risk and developing corrective action plans.
- Regulatory Compliance (State and Federal) – Builds and implements compliance programs for health systems and hospitals as well as for physician groups to ensure compliance with all plans with which the organization participates.
- Provider Contract compliance – Guidance and assistance with payer contracts negotiations and applicability and enforcement of contract provisions.
- Serves as a third-party compliance officer / consultant for numerous hospitals, health systems and physician groups.
- Hospital Inpatient (IPPS) and Outpatient (OPPS) – Provide guidance and assistance to hospitals and health systems regarding claims processing and adjudication issues including routine services and/or items (PRM 2202.6, 2202.8, 2203) and stop loss claims and/or outlier claims.

**Expert Witness and Testimony Experience:**

- United States v. Pompy – Criminal Case No. 18-cr-20454 – charged with 22 counts of Distribution of Controlled Substances, Aiding and Abetting, in violation of 21 U.S.C. §841(a)(1) and 18 U.S.C.

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 52

Expert Report of Sean M. Weiss

§2, and 15 counts of Health Care Fraud, Aiding and Abetting, in violation of 18 U.S.C. §1347 and 18 U.S.C. §2 (ECF No. 1)

- The State of Texas ex rel. Chastiny Thurmond (relator) v. Molina Healthcare, Inc. and Molina Healthcare of Texas, Inc Cause No. D-1-GV-13-000451 (Travis County, Texas, 53rd Judicial District, as of September 26, 2022 the case is under a protective order)

- United States of America v. Dr. David Lewis, et al, No:2.18-cr-20800 (Eastern District of Michigan Southern Division)

- United States vs. Brian James August, No.: 3.21-cr-00912-FM (Western District of Texas)

- United States of America v. Chesapeake ENT and Scott Saffold, MD, Civil Investigative Demand No 2019-5 (Eastern District of Virginia)

- HMSA (Blue Cross Blue Shield of Hawaii and Kristen Lindsay-Dudley – Nutrition Therapy Consultants Inc.). A Dispute Prevention & Resolution Inc (DPR NO. 20-0399) Arbitrator – Hon. Karl Sakamoto.
    - Circuit Court of the First Circuit State of Hawai`i has been filed (Civil No. 20-0001504) Nutrition Therapy Consultants, INC., Plaintiff vs. Hawaii Medical Services Association, a Hawaii non-profit Corporation

- Kristine Brecht, M.D. Settlement Hearing with Washington State Board of Medical Examiners; Case Number: M2019-94

- Centers for Medicare and Medicaid Services (Noridian) and NCA Holdings of Arizona, LLC (DBA New Promise Neuropathy Care Centers) and Dr. Ali H. Alavi; Honorable Robert Preston presiding

- United States of America v. Antonio Reyes-Vizcarrando, Indictment Criminal No. 19-481 (GAG), Violations: Title 18 United States Code § 1347, 1349, Forfeiture Title 18 United States Code § 982(a)(7), on behalf of Defendant ("Antonio Reyes-Vizcarrando")

- United States District Court for the District of New Jersey v. Morris Antebi; Case No. 20-MJ-4020

- Complete Medical Solutions, LLC (CMS) v Family Health Center, Inc (FHC) in matter of arbitration case number 01-18-0003-1682 in the Commercial Arbitration Tribunal for the American Arbitration Association; Mr. David Clark presiding

- The United States of America ex rel Judith Zissa, Plaintiffs v. Santa Barbara Country Alcohol, Drug and Mental Health Services; The County of Santa Barbara, Case No. SV14-06891-DMG (RZx) Pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 ET SEQ, Jury Trial

- North Carolina Medical Board; Coding and Documentation Auditor

Expert Report of Sean M. Weiss

- Demetric Fields, Plaintiff vs. McCormick and Schmick Restaurant Corp., Defendant; In the General Court of Justice Superior Court Division 17 CVS 005279, State of North Carolina
- South Peninsula Hospital, et al. v. Xerox State Healthcare, LLC, No. 3:15-cv-00177-TMB (D. Alaska)
- United States of America v. Chalifoux, No. 5:17-cr-00020 (N.D.W.V.)
- United States of America v. Richard Martin, No. 8:17-cr301T2YAAS (M.D. Fla.)
- United States of America v. Sheila Harris, No. 17-cr-00001-HG (D. Hawaii)
- United States of America v. Garrett Okubo, No. 17-cr-00572-JMS-01 (D. Hawaii)
- United States of America v. Dr. Jeffrey Campbell, No. 3:17-cr-00087 (W.D. Ky.)
- United States of America v. Dermatology Associates of Knoxville (DAK) – Eastern District of Tennessee
- Dermatology Associates of Knoxville, P.C., Plaintiffs, v. United States of America ex rel. And the State of Tennessee; Complaint for Declaratory Judgement and Motion to Quash Civil Investigative Demand, TCA 29-14-102
- Soft Landing Labs, LTD., v. Health Care Service Corporation, a Mutual Legal Reserve Company, d/b/a Blue Cross Blue Shield of Illinois, American Health Lawyers Association Dispute Resolution Service, Claim No. 4317
- Northside Hospital, Inc., v. Coventry Healthcare of Georgia, Inc., American Health Lawyers Association Dispute Resolution Service, Claim No. 3864
- Office of Professional Medical Conduct v. Joseph Pober, State of New York, OPMC Nos. CR-11-01-022tA, CR-12-01-0221A
- Medicare Administrative Law Judge Reviews, approximately 250 since 1998

**Certifications and Education:**

- Certified in Healthcare Compliance (CHC) – Health Care Compliance Association (HCCA) - 2017
- Certified Evaluation & Management Auditor (CEMA) – National Alliance of Medical Auditing Specialist (NAMAS) - 2014
- Certified Medical Compliance Officer (CMCO) – Practice Management Institute and Liles Parker, LLC (PMI) - 2015
- Certified Professional Medical Auditor (CPMA) – American Academy of Professional Coders (AAPC) – 02/01/2013

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 54

Expert Report of Sean M. Weiss

- Certified Professional Coder (CPC) – American Academy of Professional Coders (AAPC) – 02/06/1999
- Certified Medical Practice Manager (CMPM) – DM University – 04/2014
- Certified Professional Coder-Payer (CPC-P) – American Academy of Professional Coders (AAPC) – 04/01/2006
- Certified Medical Office Manager (CMOM) – Practice Management Institute (PMI) –2004
- Certified Medical Insurance Specialist (CMIS) – Practice Management Institute (PMI) –2004
- Certified Medical Coder (CMC) – Practice Management Institute (PMI) – 2004
- Board of Advanced Medical Coding (BAMC) / Certified Compliance Professional- Physician, Advanced SCP) specialties included in certifications: Anesthesia, Cardiology, Evaluation and Management Auditing, Orthopedics, Pain Management, Psychiatry and Behavioral Health, Radiology, and Urology
- Certified Medical Practice Executive (CMPE) – Medical Group Management Association (MGMA) – 08/1997 – Lapsed due to non-renewal (not sure of year)

**Podcasts:**

- The Compliance Guy (2021 – Current)

**Invited Lectures & Speaking Engagements (since 1997):**

- Invited on to multiple podcasts for interviews (Not Elsewhere Classifiable, ForbesBooks Podcast, NSCHBC – The Edge, Pain the Medical Picture, Urology Podcast with John C Lin, MD) 2021-Current
- Administrator Support Community for ENT (ASCENT)
- American Psychiatric Association (APA)
- The American Academy of Family Practitioners (AAFP)
- The American Academy of Professional Coders (AAPC)
- The National Alliance of Medical Auditing Specialists (NAMAS)
- The American Alliance of Orthopedic Executives (AAOE)
- The American College of Cardiology (ACC)
- The American College of Rheumatology (ACR)
- The American Dermatologic Association of Managers (ADAM)
- The American Health Law Association (AHLA)

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 55

Expert Report of Sean M. Weiss

- The American Medical Billing Association (AMBA)
- The American Otolaryngology Association (AOA)
- The American Urological Association (AUA)
- The Georgia Association of Orthopedic Executives (GAOE)
- The Medical Group Management Association (MGMA)
- The National Organization of Rheumatology Managers (NORM)
- The Nurse Practitioner Association of New York (The NPA)
- The National Society of Certified Healthcare Business Consultants (NSCHBC)
- The OrthoForum Shareholder's Meeting
- Practice Management Institute (PMI)
- The State of Hawaii Professional Coders Association (HPCA)
- The State of Kentucky Medical Group Management Association
- Columbia University
- Brigham Women and Children's
- Jansen Pharmaceuticals on behalf of the Dayton, Ohio Psychiatric Association (Division of Psychiatric Pharma)
- Miami Dade University Graduating Class
- Monitor Monday (Audit Report with Sean M. Weiss) 2019 – 2020
- OrthoVirginia Shareholder Meeting

**Presentations (Since 2020)**

- "When the OIG Comes Knocking, Will Your Practice Survive?" and "Payor Changes That Affect Your Bottom Line." California Orthopaedic Association (COA) – Apr 2020
- "OIG and Orthopedic Audit Risks in 2020." American Alliance of Orthopaedic Executives (AAOE) – May 2020
- "Staff Efficiency and Maximizing Office Flow" (Joint presentation with Jesse Overbay of DoctorsManagement) and "Utilizing APPs and Scribes in Your Practice." American Urological Association (AUA) – May 2020
- "Standard of Conduct, Non-Retaliation and Corrective Action Plan." Joint session with Amanda Waesch of Brennan Manna and Diamond. National Alliance of Medical Auditing Specialists (NAMAS) Webinar – Aug 2020

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 56

Expert Report of Sean M. Weiss

- "OIG Self Disclosure." Joint session with Frank Cohen and Stephanie Allard of DoctorsManagement. NAMAS Webinar – Sept 2020

- "Compliance and Medical Necessity: How to Cover Your Assets." Michigan Medical Billers Association (MMBA) – Sept 2020

- "A Nightmare in Rheumatology 2020/2021 'Escape and Evade." National Organization of Rheumatology Managers (NORM) – Sept 2020

- "Structuring a Corporate Compliance Program to Comply with DOJ Criminal Division Guidance." Administrator Support Community for ENT (ASCENT) – Oct 2020

- "Creating a Winning Appeal." NAMAS Webinar – Oct 2020

- "Current Auditor Action and How to Mitigate Risks." RACMonitor Webinar – Nov 2020

- "Keynote Address: A New Way of Practice Management for 2021 and Beyond" , "That Was Then, This is Now: New Patient Visit in 2021" and "The New Era of Coding for the Established Patient." American College of Rheumatology (ACR) – Nov 2020

- "Conducting an Effective GAP Analysis: The ABCs of the Process." NAMAS Webinar – Nov 2020

- "Creating a Winning Appeal." Tennessee Medical Association (TMA) Symposium – Nov 2020

- "When to Disclose and When to Refund." Joint session with Amanda Waesch of Brennan Manna and Diamond. NAMAS – Dec 2020

- "Government Pitfalls and Mitigating Risks 'OIG and OCR High Risk Targets'." The National Society of Certified Healthcare Business Consultants (NSCHBC) Winter Workshop – Jan 2021

- "What is Compliance?" NORM Education Committee (NEC) Year of Compliance Webinar – Jan 2021

- "Comparative Billing Reports: Analyzing and Responding to 'A Push by Payers to Make You Conform'." Joint session with Frank Cohen of DoctorsManagement, NAMAS Webinar – Feb 2021

- "TPE RAC Audit and Appeals." Joint session with Robert Liles of Liles Parker, RACMonitor Webinar – Mar 2021

- "Stand Your Ground With Payers." Practice Management Institute (PMI) Webinar – Apr 2021

- "Escalation Policies: What are They and What is Their Purpose?" NAMAS Webinar – May 2021

- "E&M Audit Vulnerability: Know Your Best Defense" and "2021 Incident-to: The Ins and Outs of These Problematic Services." NAMAS Virtual Conference – May 2021

- "Government Pitfalls and Mitigating Risks 'CMS, HHS and OIG High Risk Targets'." COA Virtual Conference – May 2021

Expert Report of Sean M. Weiss

- "Comparative Billing Reports (CBRs), CMS/OIG and Commercial Payors." Joint presentation with Frank Cohen of DoctorsManagement, NEC Year of Compliance Webinar – May 2021

- "Leveling the Playing Field – Audits, Appeals, Compliance and Medical Necessity." AUA 2021 Practice Management Program – May 2021

- "Self Disclosure vs. Voluntary Refund." Joint Presentation with Stephanie Allard of DoctorsManagement. NEC Year of Compliance Webinar – Aug 2021

- "Compliance Risks for Urgent Cares." NSCHBC Webinar – Sept 2021

- "Compliance Bootcamp." ASCENT Annual Conference – Oct 2021

- "Leveling the Playing Field: Medical Necessity & Appeals." ASCENT Annual Conference – Oct 2021

- "Stand Your Ground With Payors." American Medical Billing Association (AMBA) National Medical Billing & Coding Conference – Oct 2021

- "Building and Scaling an Effective Compliance Program Using DOJ Guidance: 'Evaluation of Corporate Compliance Programs'." Joint presentation with Paul Spencer, DoctorsManagement. NAMAS Webinar – Oct 2021

- "2021 DOJ Update for Evaluation of Corporate Compliance Programs." AAOE Annual Conference – Nov 2021

- "Audit Risks Comping Out of a Public Health Emergency (PHE)." TMA Symposium – Nov 2021

- "Business of Rheum: Avoiding the 2021 Audit Pitfalls." ACR Practice Management Virtual Conference – Nov 2021

- Several presentation sessions at NAMAS Annual Conference – Dec 2021

- "Audit Risks Coming out of a Public Health Emergency (PHE)." The National Society of Certified Healthcare Business Consultants (NSCHBC) Winter Workshop – Jan 2022

- "2022 OIG Risk Areas" ASCENT Webinar – Feb 2022

- "Telehealth – Or Is It?" NSCHBC Telehealth Summit – Feb 2022

- "Building an Effective Risk-Based Audit Plan" HCCA Annual Conference – Mar 2022

- "The CARES Act – A Breakdown of Risk Areas for Orthopedics Entering an Endemic" Joint presentation with Amanda Waesch, Brennan Manna Diamond (BMD). California Orthopedic Association (COA) – Apr 2022

- "Stand Your Ground With Payors" The American Academy of Professional Coders (AAPC) Columbus, GA Chapter Webinar – Apr 2022

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 58

Expert Report of Sean M. Weiss

- "Compliance Bootcamp" ACR Education Exchange – Apr 2022

- "Stand Your Ground With Payors" AAOE Annual Conference – Apr 2022

- "The Best of the Best – What Effective Managers Do to Sustain Success" AAPC Columbus, GA Chapter, May Mania – May 2022

- "MAC, RAC, SIU, TPE & CERT Audits: How to Prepare by Using CBRs" NAMAS Webinar – May 2022

- "Can You See Me Now?" & "Is There Really Such Thing as Payor Prejudice Toward a Provider?" NAMAS Virtual Conference – May 2022

- "CMS Administrative Appeals Process" Training Leader Webinar – May 2022

- "Stand Your Ground With Payors" AAPC West Palm Beach Chapter, May Mania – May 2022

- "CMS Administrative Process: Navigating the Complex World of Denials and Appeals" OncoSpark OrthoCare Summit – July 2022

- "Best of the Best: What Effective Managers Do to Sustain Success", "Leveling the Playing Field: Stand Your Ground With Payors" & "Government and Regulatory Update" AUA Practice Management & Coding Program – July 2022

- "CMS Administrative Process: Navigating the Complex World of Denials and Appeals" – ASCENT Webinar – Aug 2022

- "Stand Your Ground With Payors" Colorado MGMA – Sept 2022

- "Stand Your Ground With Payors" ASCENT – Sept 2022

- "Introduction to Medical Coding for Payment Lawyers – Resolving Coding Disputes" American Health Law Association (AHLA) Fraud and Compliance Forum – Sept 2022

- "Tales From the Trenches" DM Panel BMD Healthcare Innovation Summit – Oct 2022

- Key note address "Stand Your Ground with Payers" and "CMS Administration Appeals" AMBA Conference – Oct 2022

- "Split the Time: CMS Split-Shared Services", "Does Your Resume Tell Your Best Story (with Scott Kraft)", and "Audit Escalation: When Peer Review Should be Considered." NAMAS Conference – Dec 2022

**Board Affiliation, Steering Committees and Task Force:**

- DoctorsManagement Board of Directors (2015 - Current)
- OncoSpark Advisory Board (2021 – Current)

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 59

Expert Report of Sean M. Weiss

- American Alliance of Orthopedic Executives (AAOE) Industry Relations Advisory Board; Chairman, Indianapolis (2016-2017, 2022-2023)
- Editorial Board for VBP Monitor, Minnesota (2015 – Current)
- Editorial Board for BC-Advantage; Nevada & South Carolina (2003 – Current)
- Columbia/HCA Steering Committee; Tennessee (1999 – 2001)
- Georgia Bone and Joint Compliance Committee; Georgia (2018 – 2022)
- Cardiovascular Medicine Institute; Maryland (CVI) Compliance Committee (Current)
- Ortho Florida and IHBS Compliance Committee; Tampa (2018 – Current)
- Inova Compliance Steering Committee; Virginia (2018 – 2020)
- Articularis Health Group Steering Committee; South Carolina (2019 – Current)
- AHLA Online Dispute Resolution for Medical Bills task force (2022 – Current)

**Honors and Awards:**

- Award for Excellence in Service Journalism, United Communications Group, 2009 – DecisionHealth White Paper "7 Myths About Physician Fees"
- The Jim Altizer Memorial Award (The Medical Management Institute), 2002. Award for demonstrating the highest standards of ethical and moral character.

**Published In (since 1996):**

- TheComplianceGuyBlog.com
- Renal and Urology News
- Urology Practice Management
- RAC Monitor
- Medical Economics
- Part B News
- BC Advantage
- The Coding Edge
- MGMA Connections
- Kareo Newsletter

**Published Articles / Author or Co-Author (since 1996):**

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 60

Expert Report of Sean M. Weiss

1. Medicare Rules and Regulations – Co-author – The Medical Management Institute; 1996, 1997, 1998, 2001, 2002, 2003

2. Coding for Optimal Reimbursement – Co-author – The Medical Management Institute; 1996, 1997, 1998, 2001, 2002, 2003

3. Conducting Chart Audits – Co-author – The Medical Management Institute; 2001, 2002, 2003

4. The Health Insurance Portability and Accountability Act – Co-author – The Medical Management Institute; 1997

5. A Guide to Negotiating Managed Care Contracts – Author – The CMC Group; 2004

6. Kulhan, Storm, editor, BC-Advantage "Men on a Mission." BC Advantage, June/July 2011.

7. Sean Weiss. "The Time for Change is Now Things Will Only Get Worse." BC Advantage, Aug./Sept. 2011.

8. Sean Weiss. "How to Perform a Practice Compliance Audit Tips and Strategies from the Inside." BC Advantage, Apr./May 2012.

9. Sean Weiss. "Accounting and Finance for Non-Financial Managers Build a Solid Practice in 2012." BC Advantage, June/July 2012.

10. Sean Weiss. "Interview With Secretary of Health and Human Services (HHS) Kathleen Sebelius." BC Advantage, Oct./Nov. 2012.

11. Sean Weiss. "Understanding Healthcare from a Politician's Perspective (Newt Gingrich)." BC Advantage, Dec./Jan. 2012.

12. T. Blake King and Sean M. Weiss. "How to Value Your Practice." BC Advantage, Mar./Apr. 2013.

13. Sean Weiss. "Unrelenting CMS and Private Payer CBR Inundation of Physician Practice." The Business of Medicine, July 8, 2015.

14. Sean Weiss. "Effective Leadership in Healthcare." NAMAS, June 8, 2016.

15. Sean Weiss. "What Happened to Healthcare." The Business of Medicine, June 10, 2016.

16. Sean Weiss. "Dealing with Difficult Providers." NAMAS, June 28, 2016.

17. Sean Weiss. "Responding to "The Letter"." NAMAS, July 19, 2016.

18. Sean Weiss. "When the Government Tries to Change the Rules." NAMAS, July 29, 2016.

19. Sean Weiss. "I'm Just a Cowboy Not Really But." NAMAS Monthly Compliance Article, Sept. 27, 2016.

20. Sean Weiss. "Compliance Plans The Truth About Templates." NAMAS, Sept. 28, 2016.

21. Sean Weiss. "The World of Healthcare…" BC Advantage, Sept. 29, 2016.

22. Sean Weiss. "E&M Audits and Appeals." NAMAS Monthly Compliance Article, Nov. 8, 2016.

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 61

Expert Report of Sean M. Weiss

23. Sean Weiss. "To Disclose or Not to Disclose… That is the Question!" BC Advantage, Dec. 22, 2016.

24. Sean Weiss. "AKS Update." NAMAS Monthly Compliance Article, Jan. 3, 2017.

25. Sean Weiss. "The Truth About ZPICs." BC Advantage, May 30, 2017.

26. Sean Weiss. "DOJ Mid-Year Update." Business of Medicine, June 28, 2017.

27. Sean Weiss. "Changes to the Medicare Appeals Process." BC Advantage, Aug. 8, 2017.

28. Sean Weiss. "Berenson-Eggers Type of Service Codes." Urology Today, Aug. 10, 2017.

29. Sean Weiss. "Who Can it Be Knocking at Your Door Are You Prepared." NAMAS Monthly Compliance Article, Aug. 17, 2017.

30. Sean Weiss. "Employees of the Future in Healthcare Managing Millennials and Generation Z." BC Advantage, Aug. 23, 2017.

31. Sean Weiss. "Challenging Medical Necessity and Auditor's Requisite Skills." Business of Medicine, Aug. 25, 2017.

32. Sean Weiss. "Fear Factor The Unethical Business of Medicine." Greenbranch Publishing, Nov. 13, 2017.

33. Sean Weiss. "Creating a Culture of Compliance in 2018." BC Advantage, Jan. 9, 2018.

34. Sean Weiss. "Templates for Documenting Services." BC Advantage, Jan. 11, 2018.

35. Sean Weiss. "Be Good to Yourself So You Can Be Good For Others." BC Advantage, Feb. 27, 2018.

36. Sean Weiss. "Attestation and Notice of Failure to Comply." NAMAS, Mar. 1, 2018.

37. Sean Weiss. "Structuring a Mission Statement." NAMAS, Mar. 1, 2018.

38. Sean Weiss. "Waiver of Copay and Deductible." NAMAS, Mar. 5, 2018.

39. Sean Weiss. "Financial Remedies Language for Employment Agreement." NAMAS, Apr. 4, 2018.

40. Sean Weiss. "Legibility and the Crackdown by Payors." NAMAS, May 31, 2018.

41. Sean Weiss. "Target, Probe, and Educate." NAMAS, 27 June 27, 2018.

42. Sean Weiss. "Defending Evaluation and Management Services." AOA36 Conference, Aug. 12, 2018.

43. Lisa Eramo "How 'virtual' scribes can reduce HER headaches" Medical Economics Journal, Jan 2022, Volume 99, Issue 1

44. Sean Weiss "Medical Necessity in 2022." National Alliance of Medical Auditing Specialists Audit Tip for January 10, 2022.

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 62



**Practice Areas**
Administrative Law
Cannabis Law
Correctional Law
CMS Matters
Criminal Defense
DEA Matters
Estate Planning
Health Care Audits
Health Care Compliance
Health Care Fraud & Abuse
Health Care Law
Health Care Transactions
HIPAA & HITECH Matters
Medical Malpractice Defense
NPDB/Peer Review Matters
Pharmacy Law
Professional Licensing
General Litigation

**Florida Offices**
6841 Energy Ct.
Sarasota, FL 34240
T. (941) 893-3449

701 Waterford Way
Suite 340
Miami, FL 33126
T. (305) 712-7177

**Michigan Office**
1441 West Long Lake Rd.
Suite 310
Troy, MI 48098
T. (248) 644-6326
F. (248) 644-6324

www.ChapmanLawGroup.com

May 15, 2023
*Via Electronic Mail Only*

Dermot W. Lynch, Esq.
U.S. Department of Justice - 1400
1400 New York Avenue NW
Washington, DC 20005
Email: dermot.lynch@usdoj.gov

   Re:  *United States v. Loey Kousa*
       Case No. 7:22-cr-00008-REW-EBA-1

<u>**NOTICE OF EXPERT TESTIMONY**</u>

**James P. Murphy**

   Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) and Federal Rules of Evidence 702, 703, and 705, defense counsel provides notice that it may call Dr. James Murphy as an expert witness in its case-in-chief.

   If called, we anticipate that Dr. Murphy will provide testimony on prescribing controlled substances in the course of professional practice for a legitimate medical purpose. He will the policies and regulations that inform prescribing and elaborate on how these policies and regulations were impacted because of the COVID-19 pandemic.

   We also anticipate that Dr. Murphy will provide testimony that addresses the specific prescriptions identified in the indictment. He will discuss why these prescriptions were issued and why they were done so lawfully. Dr. Murphy will also address the CPT codes identified in the indictment and discuss his opinions on whether the underlying physical examinations and procedures were medically necessary. Similarly, Dr. Murphy will provide testimony on the alleged false statements identified in the indictment.

   If Dr. Murphy testifies he will also discuss his experience, education and training as a physician. He will elaborate on his achievements within the field of medicine and discuss his specific experience with pain and controlled substance prescribing.

   Dr. Murphy's specific conclusions on these issues outlined above are set forth in an expert report, which is included with this disclosure.

   Pursuant to revised Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, defense counsel has provided a list of Dr. Murphy's publications in the last ten (10) years as well as the testimony he has provided in the last four (4) years.

If necessary, Defendant will timely revise and supplement this disclosure. Remaining,

**Chapman Law Group**

**Ronald W. Chapman II, Esq., LL.M.**
*Counsel for Defendant Kousa*
1441 West Long Lake Road, Suite 310
Troy, MI 48098
T: (248) 644-6326
F: (248) 644-6324
RWChapman@ChapmanLawGroup.com

**Chapman Law Group**

**Matthew Pelcowitz, Esq.**
*Counsel for Defendant Kousa*
701 Waterford Way, Suite 340
Miami, FL 33126
T: (305) 712-7177
F: (248) 644-6324
MPelcowitz @ChapmanLawGroup.com

RWCII/MJP/sfa
Enclosures



**Murphy Pain Center**

720 Rolling Creek Drive Ste. 101 New Albany, IN  47150    Phone: (502) 736-3636  Fax: (877) 497-8259

James Patrick Murphy, MD, MMM, DFASAM
Medical Director
Murphy Pain Center

May 15, 2023

Matthew J. Pelcowitz, Attorney
Chapman Law Group
701 Waterford Way, Suite 340
Miami, FL 33126

RE: United States of America vs. Loey Kousa, MD; Indictment No. 7:22-cr-00008-REW-EBA;
United States District Court, Eastern District of Kentucky, Southern Division, Pikeville

Dear Matthew J. Pelcowitz, Attorney:

You asked me to write a report regarding the practices of Dr. Loey Kousa in light of
Indictment number 7:22-cr-00008-REW-EBA in United States District Court for the Eastern
District of Kentucky, Southern Division, Pikeville.

**SUMMARY**

First, regarding the prescribing and treatment practices of Dr. Loey Kousa, I have
determined that the controlled prescriptions issued by Dr. Kousa noted in the Indictment (i.e.,
Patient MS in Counts 1 through 5) were each issued for a legitimate medical purpose and in the
usual course of professional practice.

Second, regarding Count 6 of the Indictment, while I do possess a robust working
knowledge of medical billing and coding in general, I did not review the records provided with
the aim of verifying the accuracy of the CPT codes for the dates listed. Therefore, I have not
formulated an opinion regarding Count 6, beyond my opinion that documentation from the
clinical encounters could be used to support E/M the CPT codes chosen by Dr. Kousa.

Third, regarding Count 7 of the Indictment, I have determined that electrocardiograms
performed in caring for patient LG were medically necessary.

Fourth, regarding Counts 8 of the Indictment, I have determined that the documentation
of the physical exam of Patient MS on 5/13/2021 likely contains errors. However, I do not
believe the documentation errors on 5/13/2023 prove that Dr. Kousa knowingly committed fraud.

Finally, regarding Count 9 of the Indictment, of which a supposed April 23, 2021 clinical encounter is the subject, I found documentation of clinical work on that day on behalf of MS, but there was no documentation that a patient-provider clinical encounter occurred. If there was no clinical encounter on April 23, 2021, then analysis with respect to allegations of fraud in connection with a clinical encounter on that date is moot.

**RELEVANT EXPERIENCE**

I attended the University of Louisville School of Medicine and graduated in 1985, vice president of my class and recipient of the award for outstanding application to Family Practice. After medical school, I did my internship in the Department of Psychiatry at the Naval Medical Center in San Diego and, upon completion, served as a General Medical Officer at the Naval Training Center in San Diego for six months. After this time in San Diego, I attended training at the Naval Aerospace Medical Institute at NAS Pensacola, graduated, and became a U.S. Navy Flight Surgeon. I served as a Flight Surgeon from 1987-1989, deploying to the Western Pacific onboard the aircraft carrier U.S.S. Enterprise as the Attack Flight Surgeon for Carrier Air Wing Eleven, stationed at NAS Lemoore, California.

Upon completing my tour of active duty, I returned to the University of Louisville and did my anesthesiology residency from 1989-1992. I volunteered for recall to active duty military service during Operation Desert Shield in 1991 and served in the Department of Anesthesiology at the Naval Medical Center in San Diego. Upon completion of my residency I moved to Elizabethtown, Kentucky where, from 1992-1997, I worked as an anesthesiologist at Hardin Memorial Hospital for the anesthesiology company that I founded. I left my Elizabethtown anesthesiology practice in 1997 to attend subspecialty training in pain management. In 1998, I completed my fellowship in pain management at the Mayo Clinic in Rochester, Minnesota, where I was granted an academic appointment and served as an Associate Consultant and Instructor of Anesthesiology for the Mayo Medical School.

After my Mayo Clinic experience, I returned to my hometown of Louisville, Kentucky where, for over two decades I have treated patients using a multidisciplinary approach that has included, where appropriate, the prescribing of controlled substances as well as an extensive range of interventional pain treatment procedures. I still practice full time.  My office is located across the river from Louisville in New Albany, Indiana, and I am licensed to practice medicine in Indiana and Kentucky. In addition to caring for patients with chronic pain, I am also an addiction medicine specialist and treat patients with substance use disorders.

Over the years, in service to the Mayo Medical School, the University of Louisville, and the American Society of Regional Anesthesia, I have instructed medical students, resident physicians, and practicing physicians on the reasonableness, medical necessity, and utility of pain care treatments, including medications, such as those noted in the counts against Dr. Kousa. I also have years of experience as an independent physician reviewer responsible for determining the reasonableness and medical necessity of interventional pain procedures and prescriptions.

I am triple board-certified in Anesthesiology, Pain Medicine, and Addiction Medicine. I also earned a Master of Medical Management (MMM) degree from the University of Southern

California's Marshall School of Business. Since 2004, I have continued to serve the University of Louisville School of Medicine as a gratis faculty member (Assistant Clinical Professor) in the Department of Anesthesiology and Perioperative Medicine. In 2021, I was awarded the designation of Distinguished Fellow (DFASAM) by the American Society of Addiction Medicine. I am the immediate past president of the Kentucky Society of Addiction Medicine. I serve on the board of directors of the Kentucky Harm Reduction Coalition. I am the Region X Director of the American Society of Addiction Medicine (ASAM), which covers Kentucky, Alabama, Florida, Mississippi, Tennessee, Puerto Rico, and the Virgin Islands. I also represent ASAM on the American Medical Association's Substance Use and Pain Care Task Force.

I have given lectures and conducted numerous seminars regarding legitimate and appropriate prescribing principles, including Kentucky. Over the years, I have worked closely with the medical licensing boards of Kentucky and Indiana on treatment issues, and both boards currently feature on their websites prescribing guidance I have authored or assisted in writing. Numerous articles on pain management treatment and monitoring principles written by me, or with my co-authorship, have been published in regional and national medical journals. I have testified approximately twenty times in federal court as an expert witness regarding pain and/or addiction issues and have never been disqualified as an expert witness.

The opinions expressed in this report are my own, are to a reasonable degree of medical certainty, and should not be ascribed to any other individual or organization. As a matter of policy, I reserve the right to amend this report should any additional pertinent information and/or data be made available to me.

**MATERIALS REVIEWED**

I have reviewed materials provided to me by counsel, which include medical files for the two individuals named in the Indictment with the initials: LG and MS (Note: MS was an undercover agent posing as a patient.). I have also reviewed medical files for seventeen additional patients with the initials: BA, BK, DB, DD, ED, IG, JA, JM, LB, MB, MC, MR, OW, PC, RD, RW, WD. I have reviewed KASPER data. I have reviewed audio and video files pertaining to the undercover agent posing as a patient with the initials MS. I have reviewed a report by Dr. Munzing; expert witness disclosures regarding Dr. Earl Berman, Dr. Judy Theriot, and Dr. James Ely Walker; and a summary witness disclosure regarding Alison Kramer. Additional references cited in my report, and considered by me in formulating my report, are listed alphabetically after my signature at the end of the report.

**STANDARD APPLIED**

A proper review of Dr. Kousa's prescribing as it relates to Counts 1-5, requires an understanding of the legal standards applicable to the authorization to prescribe controlled substances. Title 21, Part 1306.04 provides this standard (Ref: CFR):

*A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.*

3

While the regulation provides the range of appropriate conduct it does not define the terms "usual course of professional practice" or "legitimate medical purpose." Indeed, the DEA has confirmed this (Ref: FED06):

> *There are no specific guidelines concerning what is required to support a conclusion that an accused acted outside the usual course of professional practice.*

Therefore, because medicine is an uncertain science, no entity has earned incontrovertible authority to dictate with specificity the manner in which a physician shall treat an individual's pain. However, ethical requirements do provide some guidance. For that, we can look to the American Medical Association's Code of Medical Ethics which defines the practice of medicine this way (Ref: CODE):

> *The practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering.*

The AMA's Code further explains that a physician patient relationship is established "when a physician serves a patient's medical needs." Thus, my understanding, as a practicing physician with over three decades of experience, is that in the usual course of professional practice, a physician prescribing medication must do so pursuant to a patient-physician relationship with aim of alleviating suffering.

To determine if a physician has violated 21 C.F.R. Part 1306.04, it is not sufficient to simply state that a physician ignored "red flags" or a treatment guideline, standard, or suggestion. Instead, even the CDC agrees that, "clinical decision making should be based on a relationship between the clinician and patient, and an understanding of the patient's clinical situation, functioning, and life context" (Ref: CDC); and that clinical decision-making and patient care should be individualized and patient-centered (Ref: UPDATE).

The phrase "usual course of professional practice" is simply not the same as the "standard of care." The phrase "standard of care" can be summarized as: "what a minimally competent physician in the same field would do in the same situation with the same resources" (Ref: MOFF).  And it is not a violation of the Controlled Substance Act for a physician to prescribe outside the standard of care. The federal legal threshold for prescribing controlled substances is not linked to considerations such as: standard of care, quality of care, prescriber competence, or documentation in the medical record. In fact, the federal requirement for prescribing controlled substances is not that a physician must prescribe correctly or even well. Evaluating quality of care is for settings outside of a federal courtroom (e.g., state medical boards, civil courts, peer review organizations, and credentialling bodies). In federal cases such as this one involving Dr. Kousa, the standard is only that Dr. Kousa must prescribe for a legitimate medical purpose in the usual course of professional practice.

**COVID-19**

The Public Health Service Act was used to declare a public health emergency (PHE) in the entire United States in January 2020, and gave physicians, like Dr. Kousa, the flexibility to safely treat their patients during the crisis. The PHE was renewed on April 21, 2020, July 23, 2020, October 2, 2020, January 7, 2021,  April 15, 2021, July 19, 2021,  October 15, 2021, January 7, 2022, April 12, 2022 effective April 16, 2022, July 15, 2022, October 13, 2022, January 11, 2023, and February 9, 2023. The Department of Health and Human Services (HHS) is planning for the federal Public Health Emergency (PHE) for COVID-19, declared under Section 319 of the Public Health Service (PHS) Act, to expire at the end of the day on May 11, 2023 (Ref: PHE).  The five prescriptions written for MS by Dr. Kousa in Counts 1-5, the eleven clinical encounters noted in Count 6, the service date in Count 8, and the service date in Count 9 all happed during the COVID-19 PHE. During the PHE, frontline healthcare providers, like Dr. Kousa, put their lives on the line to care for their patients.

In assessing physician prescribing practices (i.e., Dr. Kousa) during the PHE, one must not overlook the key benefits and lessons learned as a result of the pandemic. During the PHE, the DEA and states, including Kentucky, promoted flexibilities to ensure patients could continue to receive controlled medications while minimizing exposure to COVID-19. These flexibilities, including waiving required initial in-person visits prior to prescribing controlled substances via telehealth and allowing the use of telephone evaluations to initiate buprenorphine prescribing, proved to be critical in ensuring that patients like MS had access to the controlled medications they needed.

The advent of the COVID-19 PHE brought many changes to the usual course of professional practice, particularly with the physical exam component of the typical clinical visit. These changes were evident in Dr. Kousa's practice, as he relied more on telecommunications and minimized utilization of in-person encounters and hands-on physical exams. Within weeks of the first confirmed COVID-19 case in the United States, most medical schools canceled in-person patient interactions. Clinical rotations were put on hold, objective structured clinical exams were postponed, and physical exam sessions were canceled. In hospitals, performing physical exams become nearly impossible. Patients with COVID-19 were isolated per protocol, and doctors (e.g., Dr. Kousa and his colleagues) were advised to maximally leverage telephone and video technologies to communicate with all patients, regardless of their COVID-19 status. Leadership organizations like the American Medical Association offered guidance for physicians that balanced safety and benefits with risks to patients and clinical staff (Ref: CAMA). For example, see this excerpt from the AMA's *COVID-19 policy recommendations for OUD, pain, harm reduction:*



## KENTUCKY'S COVID-19 EMERGENCY RESPONSE

On March 6, 2020, Kentucky found itself in a full-blown state of emergency. The letter below from the Kentucky Cabinet for Health and Family Services outlines the new measures by which all Kentucky physicians, including Dr. Kousa, were directed to abide.



### CABINET FOR HEALTH AND FAMILY SERVICES
### DEPARTMENT FOR PUBLIC HEALTH

**Andy Beshear**
Governor

275 East Main Street, HS1WGA
Frankfort, KY 40621
502-564-3970
FAX: 502-564-9377
www.chfs.ky.gov/dph

**Eric C. Friedlander**
Acting Secretary

**Steven J. Stack, MD**
Commissioner

April 27, 2020

On March 6, 2020, Governor Andy Beshear signed Executive Order 2020-215 declaring a state of emergency in the Commonwealth due to the outbreak of the COVID-19 virus, a public health emergency.

On March 23, 2020, the Cabinet for Families and Children issued an order stating that all non-emergent and non-urgent in person medical, surgical, dental and any other healthcare practice or procedure must have ceased by close of business on March 18, 2020.

Therefore, pursuant to the authority in KRS Chapter 39A, KRS 194A.025, KRS 214.020 and Executive Order 2020-215 the Cabinet for Health and Family Services, the Department for Public Health states that the directive of March 23, 2020 is hereby modified as follows:

1. **As of April 27, 2020 all non-urgent and non-emergent healthcare services, diagnostic radiology and laboratory services may resume in the following practice areas:**
   a. **Hospital outpatient settings;**
   b. **Healthcare clinics and medical offices;**
   c. **Physical therapy settings and chiropractic offices;**
   d. **Optometrists;**
   e. **Dental offices (with enhanced aerosol protections);**

2. **Non-urgent and non-emergent surgeries and invasive procedures are explicitly excluded from this revised order and will be addressed in a subsequent order;**

3. **All providers must eliminate traditional waiting/common seating areas and utilize non-traditional alternatives (e.g., call ahead registration; waiting in car until called).**

4. **Social distancing requirements must be strictly maintained in all settings where people must wait in order to minimize direct contact between individuals within the healthcare setting;**

(continued on next page)

6

5. <u>All</u> healthcare workers, patients and others must be screened for temperature and COVID-19 symptoms upon arrival for shift or visit. <u>STAFF MUST STAY HOME IF SICK;</u>

6. All providers must plan for and ensure enhanced workplace sanitizing and disinfecting;

7. All providers must plan for and ensure enhanced hand hygiene compliance (e.g. regular handwashing schedule, use of sanitizer before and after patient contact, hand sanitizer stations throughout the office/facility);

8. All healthcare providers and staff MUST wear surgical/procedural masks while in healthcare office/facility when in contact with patients and/or staff;

9. All patients and other persons in a healthcare office/facility must wear either a surgical /procedural mask or cloth mask/face covering when in contact with patients and/or staff;

10. In high-touch clinical settings (e.g., physical therapy, chiropractic care) healthcare workers directly manipulating the patient must wear single-use non-latex gloves when manipulating the patient in addition to enhanced hand hygiene compliance; any objects and contact surfaces used for clinical services must be sanitized and disinfected between patients. All necessary steps must be taken to reduce body to body contact (e.g., PPE gown, cloth barrier, technique selection);

11. In high aerosol risk outpatient settings (e.g., dentistry, oral surgery, anesthesia, pulmonary services) all providers must wear appropriate PPE and strictly adhere to the aerosol mitigation and control measures proposed by their specific professional associations;

12. Each healthcare setting must be MUST be able to procure all necessary PPE for routine services via normal supply chains;

13. No visitors are allowed to any healthcare facility/office except when necessary for end of life, assisting vulnerable populations and caring for minor children. When visitors are allowed, they should only be for a limited time with social distancing requirements strictly enforced. <u>All</u> visitors must be screened in accordance with the instructions contained in paragraph 4 above;

14. The Commonwealth of Kentucky relies upon licensed healthcare professionals within the state to exercise these directives;

15. All healthcare professionals should check **https://govstatus.egov.com/ky-healthy-at-work** regularly for updates and posted guidance from their individual professional organizations and associations;

16. Under all circumstances where clinically possible, use of telephonic or video communication to provide telemedicine services is strongly urged. Medicare and Medicaid have WAIVED[1] typical telemedicine and HIPAA requirements and you may even use non-HIPAA compliant video services such as FaceTime, Skype, and others during the current state of emergency.


Link: https://www.chfs.ky.gov/agencies/dph/covid19/phaseIrollback.pdf

Of particular import, with respect to Dr. Kousa, are items number 3, 4, 11, and 16 that essentially eliminated waiting rooms, mandated social distancing, and "under all circumstances where clinically possible" ordered physicians to use telecommunication. It is obvious from reviewing Dr. Kousa's records that he drastically modified his practice to comply with Governor Andy Beshear's orders.

In their Spring 2020 Newsletter, the Kentucky Board of Medical Licensure, echoed the Governor's directives.



# Kentucky Board of Medical Licensure Newsletter

Hurstbourne Office Park, 310 Whittington Parkway, Suite 1B, Louisville, KY 40222

Phone (502) 429-7150          Fax (502) 429-7158          Website www.kbml.ky.gov

| Spring 2020 | Michael S. Rodman, Executive Director | Sandra R. Shuffett, M.D.,  President |
|---|---|---|

**President**
Sandra R. Shuffett, M.D.
Nicholasville

**Vice President**
Richard Whitehouse, Esq.
Louisville

**Secretary**
Kenneth J. Payne, M.D.
Louisville

Caren L. Daniels, M.D.
Morehead

Michael E. Fletcher, M.D.
Crestview Hills

Mark A. Schroer, M.D.
Newport

William C. Thornbury, M.D.
Glasgow

David W. Wallace, M.D.
Shelbyville

Bill A. Webb, D.O.
Pikeville

**Consumer Representatives**

## Reopening Healthcare Services

The Board would like to share the Beshear Administration's guidelines, for reopening certain medical services and healthcare facilities in Kentucky.  The first phase of reopening, which began on Monday, April 27, includes non-urgent/emergent healthcare services, diagnostic, radiology and lab  services in outpatient, hospital settings, healthcare clinics and medical offices, physical therapy settings and chiropractic offices, optometrists and dental offices.  The guideline, which outlines 4 phases can be found at https://chfs.ky.gov/agencies/dph/covid19/healthcareservicereopening.pdf

According to the guidance, the following criteria should be included in all phases of Kentucky's reopening of healthcare services:

- Use of telemedicine/telework instead of in-person whenever possible
- Fever and COVID-19 screening prior to entry into healthcare facility
- Discontinue use of traditional waiting rooms/common areas:
    - o Use non-traditional options, e.g., wait in car, call ahead registration, etc.
    - o Use modifications to ensure social distancing >6 feet and/or physical barriers
- Universal masking for all persons for all direct person-person contact
- Enhanced sanitizing and disinfecting; hand sanitizer stations available
- Providers must procure required PPE through commercial routes
- No visitors except end-of-life and assisting vulnerable populations
- ALL phases subject to delay or roll-back if COVID-19 surge occurs

Physicians are strongly encouraged to follow the guidelines and monitor the state's website, www.kycovid19.ky.gov for future updates on the various phases of the reopening of medical practices.

Additionally, in their Spring 2020 Newsletter, the KBML made it clear that provisions in Kentucky's controlled substances prescribing regulations (201 KAR 9:260) were suspended for the duration of the declared emergency in Kentucky.

**Advisory on Prescribing During Declaration of Emergency**

In response to the recent novel coronavirus (COVID-19) pandemic and subsequent declaration of State of Emergency by Governor Andy Beshear, the Board has received inquiries from licensees about prescribing controlled substances during this period. The Board would like to remind all of its licensees who are prescribing controlled medications (whether Schedule IIs, IIIs, IVs or Vs) of KRS 311.597(4) which calls upon licensees to conform with acceptable and prevailing medical practices and the provisions of 201 KAR 9:260 Section 2(2), which states:

*If a physician is unable to conform to professional standards for prescribing or dispensing controlled substances due to circumstances beyond the physician's control, or the physician makes a professional determination that it is not appropriate to comply with a specific standard, based upon the individual facts applicable to a specific patient's diagnosis and treatment, the physician shall document those circumstances in the patient's record and only prescribe or dispense a controlled substance to the patient if the patient record appropriately justifies the prescribing or dispensing of a controlled substance under the circumstances.*

The standards of acceptable and prevailing medical practices that apply under normal circumstances may not apply in a state of emergency. During this time it is particularly important that licensees responsibly exercise their best clinical judgment on a case-by-case and patient-by-patient basis, balancing a variety of factors (including being mindful not to contribute to the ongoing opioid epidemic). When considering whether to have an in-person patient visit, licensees should ask themselves whether the service provided would be retrospectively deemed necessary if the patient were to become infected by COVID-19 as a result of the visit. Where possible, use of telehealth technologies should be considered in an effort to limit and contain the spread of COVID-19. For instance, the current but temporary state of emergency may be a circumstance in which it would not be appropriate to require a patient to come in prior to refilling a prescription. The physician should consider whether the patient has a history of compliance with treatment directives; whether the patient is established and stable on the dose of medication. If it is a matter of refilling the same medication at the same dosage for an established patient, in order to avoid exposing the patient or others to the current environment, it may be appropriate to authorize a refill without an in-person visit. For patients beginning treatment of opioid use disorder with buprenorphine, in order to avoid exposing the patient or others to the current environment, it may be appropriate to screen the patient using telehealth technologies in order to determine whether an in-person examination is warranted. In this state of emergency, telehealth may be a clinically sound approach for some patients and some conditions, but for others it may not. It is appropriate to use telehealth resources to help make such a determination on patient-by-patient basis. The Board recognizes that the current state of emergency is a fluid environment requiring extraordinary effort, physical and mental, from many of its licensees. The Board understands the fine line of balancing treatment of individual patients with the protection of others and are grateful for its licensees' efforts to exercise sound judgment in unsound circumstances.

This passage from the KBML newsletter is particularly instructive when considering Dr. Kousa's practice of medicine during the PHE:

> *The standards of acceptable and prevailing medical practice that apply under normal circumstances may not apply in a state of emergency. During this time it is particularly important that licensees responsibly exercise their best clinical judgment on a case-by-case and patient-by-patient basis, balancing a variety of factors (including being mindful not to contribute to the ongoing opioid epidemic). When considering whether to have an in-person patient visit, licensees should ask themselves whether the service provided would be retrospectively deemed necessary if the patient were to become infected by COVID-19 as a result of the visit.*

This statement by the KBML was merely elaborating on a provision that was already a component of the regulation 201 KAR 9:260, which states in Section 1, "The professional standards established in this administrative regulation shall not apply to prescribing, dispensing, or administering a controlled substance…"

> *During the effective period of any period of disaster or mass casualties that has a direct impact upon the physician's practice*

It cannot be overlooked that all prescribing by Dr. Kousa with respect to the Counts in the Indictment took place "during the effective period" of the worst pandemic in American history and within the timeframe of Kentucky's declared state of emergency. Thus, Dr. Kousa's prescribing for MS (i.e., Counts 1-5), must not be held accountable to 201 KAR 9:260.



(Ref: SPE)

Health experts warned that people age 65 and older were the most susceptible to COVID-19 and most cases in Kentucky were within that demographic. With most Kentuckians living in rural areas—such as Johnson County, where Dr. Kousa practiced—and a majority of rural residents being over age 65, cases surged in rural counties, many of which are isolated and a considerable distance away from healthcare facilities equipped to tend to COVID-19 patients (Ref: SPE).

In fact, Dr. Kousa's county of practice was particularly hard hit by the COVID-19 pandemic. A list of the counties with highest COVID-19 infection rates in Kentucky using data from the U.S. Department of Health & Human Services ranked the highest infection rate per 100,000 residents. And within the week leading up to Nov. 10, 2022, out of one-hundred and twenty Kentucky counties, Johnson County was ranked as the sixth most affected by the pandemic (Ref: STA).

## #6. Johnson County, KY

- New cases per 100k in the past week: 162 (36 new cases, +71% change from previous week)
- Cumulative cases per 100k: 37,971 (8,425 total cases)
--- 4.7% more cases per 100k residents than Kentucky
- Cumulative deaths per 100k: 595 (132 total deaths)
--- 53.0% more deaths per 100k residents than Kentucky
- Population that is fully vaccinated: 51.3% (11,377 fully vaccinated)

(Ref: STA)

**THE DEA AND COVID-19**

It is also important to consider that the DEA offered their own guidance, which, by the way, is still in effect and clearly described on the DEA website by this graphic from the website, titled, "How to Prescribe Controlled Substances to Patients During the COVID-19 Public Health Emergency" (see chart below, Ref: TREE).

These DEA policies became effective March 31, 2020 and were very helpful in allowing patients like MS more access to needed care from physicians like Dr. Kousa. Consequently, on May 3, 2023 the DEA, after receiving "a record 38,000 comments on its proposed telemedicine rules," decided to extend the current flexibilities enacted during the COVID-19 PHE (Ref: EXT). The following day, the AMA published a message in support of the DEA's decision (REF: FLEX):

*The American Medical Association (AMA) applauds the Drug Enforcement Administration's (DEA) decision to extend flexibilities in the prescribing of controlled substances through telehealth patient visits beyond the COVID-19 public health emergency. These medications, including those used to treat opioid use disorder, are a vital form of care for millions of Americans who have come to rely on safe and effective telemedicine appointments.*



(Ref: TREE)

**COUNTS 1 THROUGH 5**

Dr. Kousa was charged with the treatment of patient MS in Counts 1 through 5 of the Indictment. MS was an undercover agent deceptively posing as a legitimate patient.

With respect to Count 1, Dr. Kousa is accused of prescribing the FDA-approved pain medication tramadol 50 mg (60 pills) not for a legitimate medical purpose and not in the usual course of professional practice.

With respect to counts 2 through 5, Dr. Kousa is accused of prescribing the FDA-approved pain medication hydrocodone 5 mg-acetaminophen 325 mg not for a legitimate medical purpose and not in the usual course of professional practice (see the chart below from Indictment).

| Count | Approximate Date Prescription Written | Substance Name | Schedule of Controlled Substance | Quantity |
|-------|---------------------------------------|----------------|----------------------------------|----------|
| 1 | June 10, 2021 | Tramadol | IV | 60 |
| 2 | July 8, 2021 | Hydrocodone | II | 30 |
| 3 | August 5, 2021 | Hydrocodone | II | 30 |
| 4 | September 2, 2021 | Hydrocodone | II | 30 |
| 5 | September 30, 2021 | Hydrocodone | II | 30 |

Note: Each prescription for hydrocodone-acetaminophen was written for the lowest available hydrocodone dosage unit (5 mg hydrocodone), which only amounted to a total of 10 mg of hydrocodone per day (see image below, taken from KASPER).

| Subject Name : | SMITH, MICHAEL WAYNE | | | Subject DOB : | 04/10/1971 | |
|---|---|---|---|---|---|---|
| Address : | 5623 Route 172 | | | | | |

| Date Filled | Qty | Days | RX# | Refill | Drug Name | |
|---|---|---|---|---|---|---|
| 06/10/2021 | 60 | 20 | 4446729 | New | Tramadol Hcl 50MG | |
| | | | Dr. Kousa,Loey | MD | Paintsville | |
| 07/09/2021 | 30 | 15 | 2218586 | New | Hydrocodone Bitartrate/Ac 325MG/5MG | |
| | | | Dr. Kousa,Loey | MD | Paintsville | |
| 08/05/2021 | 30 | 15 | 2219008 | New | Hydrocodone Bitartrate/Ac 325MG/5MG | |
| | | | Dr. Kousa,Loey | MD | Paintsville | |
| 09/02/2021 | 30 | 15 | 2219434 | New | Hydrocodone Bitartrate/Ac 325MG/5MG | |
| | | | Dr. Kousa,Loey | MD | Paintsville | |
| 09/08/2021 | 42 | 14 | 4449704 | New | Gabapentin 100MG | |
| | | | Dr. Kousa,Loey | MD | Paintsville | |
| 09/30/2021 | 60 | 20 | 4450397 | New | Gabapentin 100MG | |
| | | | Dr. Kousa,Loey | MD | Paintsville | |
| 09/30/2021 | 30 | 15 | 2219831 | New | Hydrocodone Bitartrate/Ac 325MG/5MG | |
| | | | Dr. Kousa,Loey | MD | Paintsville | |

The accusations in Counts 1 through 5 are not supported by the evidence I reviewed. On the contrary, each of the prescriptions were issued by Dr. Kousa for a legitimate medical purpose and in the usual course of professional practice, especially considering he was prescribing during the declared COVID-19 PHE gripping our nation as a whole, and Kentucky in particular.

Tramadol, a DEA schedule IV controlled substance medication was prescribed to patient MS on June 10, 2021 and was the medication named in Count 1.

Tramadol is a medication prescribed by clinicians to treat moderate to moderately severe pain in adults, however, as a weak opioid, the drug is not usually effective by itself for the treatment of severe pain or long-term chronic pain. Tramadol is an atypical synthetic analgesic which has tremendous use in acute pain, dental pain, labor pain, chronic pain, cancer pain mostly due to its dual mechanism of action. Tramadol is a centrally acting weak mu-opioid receptor analgesic, is used worldwide, and is listed in many medical guidelines for pain management. Tramadol is a combination of synthetic opioid and monoamine reuptake inhibitor (MRI). The opioid works on the opioid centers of the brain while the MRI works by inhibiting the reuptake of both norepinephrine and serotonin. The effect is to relieve pain while offsetting the depressant effect of the opioid with the stimulant MRI. Tramadol's mild opioid effect is only about one-tenth as strong as that of morphine. Tramadol was approved by the United States Food and Drug Administration (FDA) in 1995. At that time, the drug was not classified as a controlled substance and was considered to be safe. Since it was the only unregulated opioid-type drug on the market, tramadol was relatively easy to obtain and was often given to patients out of physician offices as samples. In 2010, the Assistant Secretary of the Department of Health and Human Services (HHS) recommended to the United States Drug Enforcement Agency (DEA) that tramadol be classified as a Schedule IV controlled substance. This classification of tramadol was approved after hearings, and the drug became a Schedule IV controlled substance in 2014. According to the DEA, schedule IV drugs are defined as drugs with a low potential for abuse and low risk of dependence. Compared with other full-agonist opioids such as morphine, tramadol does not exhibit much in the way of serious adverse effects with very limited dependency potential in therapeutic doses. Overall, tramadol is considered safe, as it does not cause respiratory depression and addiction when compared to other opioid analgesics (Ref: SCI).

The use tramadol, a relatively weak schedule IV medication, was a clinically reasonable choice of analgesic to treat MS's reported pain. Dr. Kousa's prescription of tramadol on June 10, 2021 was for a legitimate medical purpose and in the usual course of professional practice.

Hydrocodone-acetaminophen, a DEA schedule II controlled substance medication, was prescribed to patient MS on July 8, August 5, September 2, and September 30 of 2021, and this was the medication named in Counts 2, 3, 4, and 5.

Hydrocodone is the most frequently prescribed opioid in the United States. Treatment with hydrocodone has been shown to be effective in reducing pain intensity and in maintaining analgesia over time without the need for continued dose increase showed positive effects also on the health-related quality of life. Hydrocodone is indicated for moderate-to-severe pain. The combination of hydrocodone with acetaminophen (i.e., multimodal treatment) is more efficacious than hydrocodone alone. Hydrocodone is a full-agonist opioid that interacts with the

mu-opioid receptors and, to a lesser extent, with delta receptors in the central nervous system. The mechanism of action of acetaminophen (e.g., Tylenol) is not fully understood. The hypothesis has been that analgesia from acetaminophen results from cyclooxygenase inhibition and activation of descending serotonergic inhibitory pathways in the central nervous system. Trends show that the legal use of hydrocodone in the United States is decreasing, most likely due to an upgrade by the federal government in the classification of hydrocodone from a schedule III to a schedule II drug in October 2014.  Abuse of hydrocodone seems to be lower than the oxycodone abuse (Ref: FRONT).

The use hydrocodone-acetaminophen, an FDA-approved pain medication, was a reasonable choice of analgesic to treat MS's report of pain. Dr. Kousa's prescription of hydrocodone-acetaminophen in Counts 2 through 5 was in each instance for a legitimate medical purpose and in the usual course of professional practice.

MS came to Dr. Kousa seeking medical care on 4/15/2021. MS fraudulently presented as a legitimate patient, when in fact, MS was an undercover agent sent to gather evidence pertaining to Dr. Kousa's medical practice. Registration forms were completed, consent forms were administered, and a prescribing agreement was enacted on 04/23/2021, however no prescriptions for controlled substances were issued at this visit on 4/15/2021. Diagnostic tests were ordered, which included a urine drug screen that was reported as negative for any drugs of abuse. An x-ray of the left shoulder was performed on 4/16/2021, which did not reveal an acute fracture or acromioclavicular separation. KASPER was queried prior to every visit. Dr. Kousa began seeing MS in the role of primary care physician and treated numerous conditions allegedly afflicting MS, pain being one of those conditions. Dr. Kousa listed the following diagnoses on 4/15/2021, indicative of treating MS as a whole person, not just as a patient with pain:

> Fatigue
> Primary hypertension
> Familial hypercholesterolemia
> Long term use of opiate analgesic
> Left shoulder Pain
> Bipolar affective disorder, unspecified
> Colon cancer screening
> Screening prostate specific antigen

MS was next seen by Dr. Kousa on 5/13/2021, and a nine element physical exam was documented. The next visit was on 6/10/2021 (i.e., Count 1), almost two months after the initial visit**.** To address MS's left shoulder pain, ibuprofen 800 mg by mouth three times daily was initiated.  At this visit the schedule IV pain medication tramadol was also issued: 50 mg, every six hours, as needed, for pain, sixty pills in total. Tramadol was issued after MS asked for something for pain. MS complained to Dr. Kousa that he had been taking acetaminophen for pain but was miserable and unable to sleep at night due to continued pain. Dr. Kousa's controlled substance agreement explained the risks of using opioid medications, thereby documenting informed consent.

15

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 79

The next visit was on 7/8/2021 (Count 2) and the tramadol was discontinued. Ibuprofen was continued. Treatment with hydrocodone 5mg-acetaminophen 325mg was initiated, but only thirty pills were prescribed for the entire month. At this visit, Dr. Kousa tapered MS's average daily morphine milligram equivalent by approximately 50% (i.e., tapered from an MME of 10 mg down to 5 mg). The next follow up was not until 8/5/2021 (Count 3), and the hydrocodone-acetaminophen prescription was renewed at a stable dose and amount. The next visit was on 9/2/2021 (Count 4) and the hydrocodone-acetaminophen prescription was again renewed at a stable dose and amount.

The next visit was on 09/08/2023. During this visit, MS complained to Dr. Kousa about neck pain and low back pain. MS stated his neck pain traveled to his left shoulder, suggesting cervical radiculopathy. Dr. Kousa initiated gabapentin. Dr. Kousa also initiated a workup for cervical radiculopathy by ordering cervical spine x-rays. MS also complained of low back pain, and Dr. Kousa initiated a workup by ordering lumbar spine x-rays. MS asked Dr. Kousa for more hydrocodone, however Dr. Kousa declined. Other medications were continued at stable doses.

Gabapentin is a non-scheduled medication in some states and is scheduled in others. The DEA does not consider gabapentin to be a scheduled controlled substance, however Kentucky does have gabapentin listed as a schedule V controlled medication. It is important to note that even if the Kentucky pain regulations were in effect during the COVID-19 public health emergency, Kentucky law exempts schedule V medications (i.e., gabapentin) from the Kentucky pain regulations (Ref: KAR).

- The following are exceptions to standards in 201 KAR 9:260:
  - Patients as part of the patient's hospice or end-of-life treatment;
  - Patient admitted to a hospital as an inpatient, outpatient, or observation patient;
  - Cancer patients or pain related to cancer treatment;
  - Patients in long-term care facilities;
  - During any period of disaster or mass casualties;
  - In a single dose prescribed or dispensed to relieve anxiety, pain, or discomfort for a diagnostic test or procedure;
  - Any Scheduled V Controlled Substance;

Link: https://kbml.ky.gov/hb1/Documents/Summary%20of%20201%20KAR%209_260.pdf

Gabapentin is commonly used in treating pain as an adjunct to opioid therapy and as part of a multi-modal treatment plan. Gabapentin is also among the most commonly used anticonvulsants for neuropathic pain (Ref: GABA). Dr. Kousa's clinical judgment to treat MS with gabapentin was sound. MS was complaining of pain that was consistent with nerve entrapment (i.e., neuropathic pain). Pain pathophysiology is complex and almost always involves multiple mechanisms. There is neuropathic pathophysiology in addition to nociceptive pathology. Thus, there is often a need for nonopioid analgesics to be used in combination with opioids. This was the case with MS. Gabapentin is anti-hyperalgesic, and it potentiates opioid

analgesia when the two drugs are co-administered. Gabapentin can interfere with some of the mechanisms of opioid resistance often considered associated with the clinical phenomena of neuropathic pain and tolerance. Adding gabapentin to an opioid analgesic is safe and, at the doses generally employed, it does not worsen opioid side effects in most cases. The goal of adding gabapentin is to improve analgesia, quality of life and function, without excessive side effects. The improvement of analgesia obtained with gabapentin is in large part due to an opioid-sparing effect. Gabapentin is relatively safe to use. It has no major drug interactions and does not induce hepatic enzyme activity. Therefore, the gabapentin prescribed for MS was appropriate (Ref: NP).

The next visit was on 9/30/2021 (Count 5). The ibuprofen, gabapentin, and hydrocodone-acetaminophen prescriptions were renewed at a stable dose and amount. The final visit was on 10/28/2021. Ibuprofen was continued. Gabapentin and hydrocodone-acetaminophen were discontinued.

The patient record for MS contained a summary section listing: active problems, surgeries, medications, allergies, social history, review of systems, and a complete physical exam. When viewed in its entirely, the patient record for MS contained enough information to justify the relatively low doses of opioid medications prescribed by Dr. Kousa, i.e., there was a reasonably thorough evaluation of the patient (including a history and physical exam); there was an individualized treatment plan tailored to the presenting medical problems; additional information (e.g., lab tests and other diagnostic studies) was obtained when necessary; periodic review of the patient's progress was done; treatments were adjusted as needed; and documentation was adequate to fulfill the primary purpose of medical record—to help Dr. Kousa care for his patient. With respect to Counts 1 – 5, Dr. Kousa's prescribing was for legitimate medical purposes and in the usual course of professional practice.

**COUNT 6**

With respect to Count 6 , Dr. Kousa is charged with fraudulently submitting the CPT codes in for the care he provided to patient MS and patient LG. Dr. Kousa is accused of fraudulently submitting the CPT code 99205 on 4/15/2021 for care provided to MS.  Dr. Kousa is also accused of fraudulently submitting the CPT code 99214 on 5/13, 6/10, 7/8, 8/5, and 9/30 of 2021 for care provided to MS. Dr. Kousa is also accused of fraudulently submitting the CPT code 99215 on 09/02/2021, and 09/08/2021 for care provided to MS. And Dr. Kousa is accused of fraudulently submitting the CPT code 99215 on 8/2/2021 for care provided to LG. Dr. Kousa is also accused of fraudulently submitting the CPT code 99214 on 08/30/2021, and 09/27/2021 for care provided to LG.

Current Procedural Terminology (CPT) codes offer doctors and health care professionals a uniform language for coding medical services and procedures to streamline reporting, increase accuracy and efficiency. CPT codes are also used for administrative management purposes such as claims processing and developing guidelines for medical care review. E/M stands for "evaluation and management".  E/M coding is the process by which physician-patient encounters are translated into five digit CPT codes to facilitate billing. For outpatient office visits there are

five levels of E/M codes that are supposed to reflect the complexity, depth and breadth of the clinical encounter. Typically physicians and/or their staff will document information that reflects portions of what happened at a particular visit. A CPT code (e.g., 99213) can then be submitted to a third-party payer as a bill for service.

In 2017, CMS launched the "Patients over Paperwork" initiative to reduce unnecessary regulatory burden to allow physicians to concentrate on their primary mission: improving patient health outcomes. CMS believed that cutting "red tape" would help patients by allowing physicians to focus on care instead of paperwork. CMS was well aware of their overly-burdensome and unnecessary regulations and set out to eliminate these impediments to physicians focusing on their primary mission (Ref: PAPER). This initiative was in response to the healthcare community's complaints regarding excessive federal regulation. The problem's extent was clear when considering that CMS averaged 58 rules published annually, with nearly 11,000 pages of new regulatory text each year. Furthermore, a study in *Annals of Internal Medicine* reported that primary care physicians spent 27 percent of their time on clinical services and 49 percent of their time on administration (Ref: PAPER). As a result of the ever growing burden of medical record documentation, CMS adopted significant changes to the CPT requirements that went into effect on January 1, 2021. The updates to CPT coding was aimed at reducing documentation requirements for clinicians and free physicians and care teams from clinically irrelevant administrative burdens that led to time-wasting note bloat and box checking. The changes in CPT codes included: (a) eliminating history and physical exam as elements for code selection; and (b) allowing physicians to choose the best patient care by permitting code level selection based on medical decision-making (MDM) or total time.

Specifically, regarding Count 6 of the Indictment, while I do possess a robust working knowledge of medical billing and coding in general, I did not review the records provided with the aim of verifying the accuracy of the CPT codes for the dates listed. Therefore, I have not formulated an opinion regarding Count 6, beyond my opinion that documentation from the clinical encounters could be used to support E/M the CPT codes chosen by Dr. Kousa.

| Approximate Date of Service | Visit Billed As | Patient |
|---|---|---|
| 4/15/2021 | 99205 | M.S. |
| 5/13/2021 | 99214 | M.S. |
| 6/10/2021 | 99214 | M.S. |
| 7/8/2021 | 99214 | M.S. |
| 8/5/2021 | 99214 | M.S. |
| 9/2/2021 | 99215 | M.S. |
| 9/8/2021 | 99215 | M.S. |
| 9/30/2021 | 99214 | M.S. |
| 8/2/2021 | 99215 | L.G. |
| 8/30/2021 | 99214 | L.G. |
| 9/27/2021 | 99214 | L.G. |

**COUNT 7**

With respect to Count 7, Dr. Kousa is charged with fraudulently submitting claims for medical services that were allegedly medically unnecessary or not provided, including, but not limited to, electrocardiograms billed under CPT codes 93000 and 93224 for patient LG. Regarding Count 7 of the Indictment, I have determined that electrocardiograms performed in caring for patient LG were medically necessary.

The four principles of medical ethics represent a framework for analyzing the proper action to take caring for a patient. These four principles are: (1) beneficence – doing good; (2) nonmaleficence – avoiding harm; (3) autonomy – the patient's freedom of choice; and (4) justice – being fair.  The limit to any therapeutic (e.g. prescriptions) or diagnostic (e.g., electrocardiograms) intervention has always been the adverse-effect profile. When the harms associated with an intervention begin to outweigh the potential benefits, it is time to reconsider the clinical decision-making.

| Date of Service | Code Billed | Patient |
|---|---|---|
| 2/18/2019 | 93000 | L.G. |
| 5/13/2019 | 93000 | L.G. |
| 7/8/2019 | 93000 | L.G. |
| 9/4/2019 | 93000 | L.G. |
| 9/30/2019 | 93224 | L.G. |
| 10/28/2019 | 93000 | L.G. |
| 11/25/2019 | 93000 | L.G. |
| 12/20/2019 | 93000 | L.G. |
| 1/20/2020 | 93000 | L.G. |
| 2/17/2020 | 93000 | L.G. |

LG had hypertension and shoulder pain and was taking meloxicam for pain. The risks from the EKGs (electrocardiograms) were essentially none. The benefits included early detection of cardiac abnormalities and cardiac ischemia. LG's hypertension put him at risk of cardiac disease, and his treatment with meloxicam put him at risk for cardia arrhythmias. NSAIDs (e.g., meloxicam) are known to carry a risk of cardiovascular disease, including an increased risk for blood clots, stroke, or a heart attack. The risk with meloxicam appears higher than with ibuprofen and can increase the risk of a heart attack and stroke.  LG's EKGs were not normal with findings ranging from atrial fibrillation, atrial ectopic beats, possible left atrial hypertrophy, and left anterior fascicular block to ischemic changes and abnormal repolarization.

Since the diagnostic benefit of EKGs, regardless of the frequency, outweighs the risks of EKG (i.e., no risk at all), it was reasonable and appropriate for Dr. Kousa to order frequent EKGs for his patient, LG, who had cardiac risk factors that included: hypertension, NSAID therapy, and a history of abnormal EKG. The EKGs performed on LG were medically necessary.

**COUNT 8**

With respect to Count 8, Dr. Kousa is charged with false statements relating to health care matters. Regarding Counts 8 of the Indictment, I have determined that the documentation of the physical exam of Patient MS on 5/13/2021 likely contains errors. Indeed, much of what was documented on 5/13/2021 could represent findings easily gleaned from a safe "social-distanced" observational exam – as was common practice during the COVID-19 Public Health Emergency. However, some of the findings that were documented on 5/13/2021 would seem to require physical contact with the examiner. However, I do not believe the documentation errors on 5/13/2023 prove that Dr. Kousa knowingly committed fraud. I say this because, based upon my review of the records for MS, as well as other Dr. Kousa patient records, it is apparent that the physical examination documentation for MS on 5/13/2021is the result of a cut-and-paste feature common to many electronic health record (EHR) programs, whereby a standard normal physical exam is pre-populated in the chart. If the examiner or scribe does not edit this pre-populated physical exam, then erroneous information might be documented and remain in the record until it is discovered and corrected at a later date, which, by the way, is acceptable practice.

Errors in documentation due to EHR's are commonplace in most every healthcare setting, often inadvertently due to the copy-and-paste feature built into most EHR software programs. In fact, a 2009 study from the *Journal of General Internal Medicine* found that over 70% of electronic medical records contained errors and outdated information. Still, the study concluded that, while physicians recognized there can be potential deficits in EHR notes written using the copy-and-paste feature, the majority of physicians continued to use the copy-and-paste feature to write notes and did not perceive an overall negative impact on physician documentation or patient care (Ref: CPF). In practice, when documentation errors are discovered, even if it is months or years later, it is entirely acceptable to make corrections using a time stamp to document when the correction occurred along with what information was subject to correction.

**COUNT 9**

With respect to Count 9, Dr. Kousa is charged with false statements relating to health care matters. Regarding Count 9 of the Indictment, of which a supposed April 23, 2021 clinical encounter is the subject, I did not find an April 23, 2021 encounter note for Patient MS in the records reviewed. There was documentation of clinical work on that day on behalf of MS, but there was no documentation that a patient-provider clinical encounter occurred. If there was no clinical encounter on April 23, 2021, then analysis with respect to allegations of fraud in connection with a clinical encounter on that date is rendered moot.

| Count | Approximate Date Record Created | Record |
|:---:|:---:|:---:|
| 8 | 5/13/2021 | Record of Physical Exam of Patient M.S. |
| 9 | 4/23/2021 | Encounter Note for Patient M.S. |

**ADDITIONAL FOUNDATION, BASES, AND REASONS FOR MY OPINIONS**

**MEDICAL NECESSITY**

Patient care decisions, such as the timing of follow-up visits, ordering of tests (e.g., urine drug tests), scheduling and performing procedures (e.g., interventional pain procedures), and prescribing medications (e.g., controlled substances for pain) should be influenced by both the art and science of medicine – and, as the 2016 CDC Guideline for Prescribing Opioids for Chronic Pain rightly points out, "Clinical decision making should be based on a relationship between the clinician and patient, and an understanding of the patient's clinical situation, functioning, and life context" (Ref: CDC). When a patient has a medical need, whether it be subjective (e.g., pain), or objective (e.g., inflammation, nerve entrapment, arthritis, etc.) a medical necessity exists (Ref: CODE).

**TREATING PAIN IS A LEGITIMATE MEDICAL PURPOSE**

Pain is personal. Pain is subjective. Pain cannot be quantified. Pain is not a number to be circled on a one-to-ten scale. It is not a vital sign, like blood pressure or heart rate. Pain, according to the International Association for the Study of Pain, is an "unpleasant sensory and emotional experience," and "a person's report of an experience as pain should be respected." (Ref: IASP). The evidence I reviewed indicates that Dr. Kousa was treating the patients named in the Indictment with FDA-approved medications for the purpose of treating their reported pain. Thus, in each instance, Dr. Kousa's treatment served a legitimate medical purpose.

**THE USUAL COURSE OF PROFESSIONAL PRACTICE IS NOT THE SAME AS THE STANDARD OF CARE**

When assessing the appropriateness of a physician's prescribing, it is important to understand the concept of "standard of care" as it relates to the usual course of professional practice. They are not one in the same. Standard of care can be defined as:

> *what a minimally competent physician in the same field would do in the same situation, with the same resources* (Ref: MOFF).

Distinct from the standard of care, the usual course of professional practice encompasses a wide range of actions. It is not a standard written in stone. It is a process, a journey. Treating a patient's medical problem is the journey's destination, and the course of professional practice is the path chosen by the physician to get there.

**VENUE**

There are many venues better suited than a federal criminal courtroom to oversee, regulate, and arbitrate the practice of medicine. The medical profession has abundant layers of accountability, such as: credentialling bodies, specialty societies, peer review agencies, accrediting services, certifying boards, state medical boards, and a robust tort system to settle

civil disputes. These forums exist to deal with errors, skill deficiencies, training gaps, impairments, standard of care issues, consumer complaints, and ethical concerns. The criminal courts, by contrast, should be reserved for cases where, in the DEA's own words, "the physician's conduct is not merely of questionable legality, but instead is a glaring example of illegal activity" (Ref: FED06).

**OPIOIDS ARE EFFECTIVE PAIN RELIEVERS**

With respect to opioid medications prescribed for the purpose of treating pain, a 2010 Cochrane Review, considered the gold standard of reviews of clinical studies, concluded that addiction due to treating pain with opioids was "rare" and that:

> *Patients who are able to continue opioids long-term experience clinically significant pain relief* (Ref: COCH).

According to the Massachusetts General Hospital Handbook of Pain Management, Second Ed.:

> *Opioids are the core pharmacologic treatment for pain. They are the mainstay for both the treatment of acute and cancer pain, and although controversy still exists over their use in chronic non-malignant pain they are increasingly used for this indication also. They are the only pain medications that have no ceiling effect, and are therefore the only systemic treatment for severe accelerating pain.* (Ref: MASS)

**MANY MEDICINES CAN TREAT PAIN**

Dr. Kousa used a multi-modal approach in caring for his patients. He used controlled substances where they were medically indicated, and also used other classes of medications in an adjunctive manner. This enabled him to attack his patients' pain and related conditions from multiple angles. Such an approach is considered to be superior in many instances, although not all—it all depends upon the individual circumstances for each patient. In their widely published textbook, *Responsible Opioid Prescribing*, the Federation of State Medical Boards offered this guidance (Ref: ROP):

> *There is no psychopharmacological drug group that is not also known to have some analgesic effects—even if each drug group is not an ideal choice for treating pain.*

The FSMB text goes on to specifically list among the medications where there is overlap between analgesic and psychiatric medications, with among them being: opioids, NSAIDs, antidepressants, anticonvulsants, stimulants, neuroleptics, and benzodiazepines.

**THE USUAL COURSE OF PROFESSIONAL PRACTICE:**
**PHYSICIAN - PATIENT - PROCESS**

The usual course of professional practice consists of the actions taken by physicians in providing care for their patients. While complex guidelines, policies, and regulations dealing

with medical issues change with regularity and often become outdated as soon as the ink dries on the paper on which they are written, fundamental characteristics inherent to the usual course of professional practice for physicians have stood the test of time. These characteristics can be divided into three categories: (1) physician, (2) patient, and (3) process—and Dr. Kousa's care of the patient named in the Indictment (MS) fulfilled the usual course of professional practice in all three categories.

**PHYSICIAN**

Let us examine the physician-related characteristics. There are three: (a) education, (b) licensing, and (c) scope of practice. First, all physicians and are well-educated and have graduated from medical school. Second, all practicing physicians have a state medical license; and if they prescribe controlled substances, they have a DEA license. And third, in the usual course of professional practice, services provided by a physician are consistent with the physician's scope of practice, including the physician's education, training, experience and ability. (Ref: FSMT)

Without question, Dr. Kousa was well-educated, properly licensed, and treated the patients named in the Indictment within his scope of practice as a primary care physician.

**PATIENT**

There are also three patient-related characteristics: (a) medical need; (b) patient-physician relationship; and (c) purpose of benefit to the patient.

First, Dr. Kousa's patient MS in the Indictment had legitimate medical needs. Pain not only constitutes a medical need, but is the most common reason people seek healthcare (Ref: LAN).

Second, Dr. Kousa established a bona fide patient-provider relationships with his patient MS.  The physician-patient relationship is fundamental to the provision of acceptable medical care. The well-being of patients is dependent upon a collaborative effort between the physician and patient and is based on the mutual understanding of the shared responsibility for the patient's health care. This relationship begins when an individual with a health-related matter seeks care from a physician. (Ref: FSMT)

The American Medical Association's Code of Ethics explains how the patient-physician relationship comes about:

> *A patient-physician relationship exists when a physician serves a patient's medical needs.*  (Ref: CODE).

The patient-provider relationship is so important that the authors of the 2016 *CDC Guideline for Prescribing Opioids for Chronic Pain* concluded their introductory section with this statement:

Exhibit A to Gov't Motion on Def. Expert Testimony -- Page 87

*Clinical decision making should be based on a relationship between the clinician and patient, and an understanding of the patient's clinical situation, functioning, and life context.*

Dr. Kousa clearly established a therapeutic patient-provider relationship with the patient MS named in the Indictment.

And third, Dr. Kousa's clinical decisions were individualized and a reasonable reviewer can see that his actions were in an effort to improve his patient's quality of life and alleviating the suffering.

The facts of this case allow me to conclude that Dr. Kousa established a meaningful patient-physician relationship with patient MS named in the Indictment—who led Dr. Kousa to believe that MS suffered from a painful disorder—and prescribed medications and treatments known to alleviate pain, in an effort to benefit his patient MS.

**PROCESS**

Simply put, physicians do two things: diagnose and treat. This means that in the usual course of professional practice, a physician obtains a medical evaluation and collection of relevant clinical history commensurate with the presentation of the patient in an effort to establish diagnoses and identify underlying conditions or contra-indications to proposed treatments (Ref: FSMT).

Dr. Kousa documented this process, as do most physicians, in a manner that represented the well-known "S.O.A.P." format (i.e., Subjective, Objective, Assessment, & Plan). Dr. Kousa obtained information—some of which was subjective (e.g., patient descriptions of symptoms) and some of which was objective (e.g., test results)—that, based upon his knowledge, reason, and intuition, allowed him to make an assessment (i.e., a diagnosis), and ultimately a plan of care for his patient. This is the usual course of professional practice. This process is ongoing, is continually modified by new information, is never fully completed, and is not hindered by a requirement for complete diagnostic certainty (Ref: NAS).

Ways that physicians gather information vary and can include activities such as: taking a history, conducting a physical exam, performing tests, or consulting other clinicians. These are not the only methods a physician can use to gather information, nor is each method mandatory. Indeed, for telemedicine a physical examination is limited only to audio-visual communication without any hands-on examination; furthermore in situations of on-call after hours cross-coverage, only audio or texting data might be available – and this is wholly acceptable if in the physician's judgment enough information can be obtained. The Federation of State Medical Boards was very clear in their textbook, *Responsible Opioid Prescribing* (Ref: ROP):

*The tests performed, questions asked, and evaluations made should be tailored to the patient as guided by the physician's clinical judgment. For example, a physical examination may or may not be required at each follow up visit.*

In response to the COVID-19 emergency, the DEA's website still allows physicians to evaluate and even prescribe controlled substances (i.e., like the medications for which Dr. Kousa is accused of criminally prescribing) via audio-visual telecommunication without having to interact in-person with their patients (Ref: DEA19). These references point out that, although it may seem important that physician have all of the information, really, the essential ingredient in the diagnostic process is that the physician has *enough* information.

Information-gathering approaches can be employed at different times, and diagnostic information can be obtained in different orders from a variety of sources. It is a continuous process of data gathering, integration, interpretation, and re-evaluation – a process that, based on the facts and evidence I reviewed, was clearly fundamental to Dr. Kousa's usual course of professional practice.

Absolute certainty in diagnosis is wholly unattainable, no matter how much information is gathered, how many observations are made, how extensive a physical exam might be, how many records are reviewed, how many consults are obtained, or how many tests are performed. Frankly, it can be very difficult to determine which diagnosis is indicated by a particular combination of symptoms, especially if the symptoms are nonspecific, like the symptom of pain (Ref: NAS). Medicine was, is, and always will be a science of uncertainty and an art of probability (Ref: OSLER).

In summary, Dr. Kousa's actions relating to the patient MS named in the Indictment encompassed the (1) physician, (2) patient, and (3) process characteristics of a physician's practice of medicine. Dr. Kousa s treatment of his patient MS named in the Indictment was consistent with the practice of medicine and the usual course of professional practice. Dr. Kousa had the required training and licensure. He treated his patient within the accepted scope of practice for a primary care physician. Dr. Kousa's patient reported legitimate pain, and the treatments Dr. Kousa provided were for a legitimate medical purpose. Dr. Kousa's clinical actions were performed in an effort to alleviate his patient's suffering. Dr. Kousa evaluated his patient MS named in the Indictment regularly. Thus, I can conclude that Dr. Kousa was acting like a physician is expected to act. Based on my review of the available evidence, Dr. Kousa acted in objective and subjective good faith in treating his patient MS referenced in the Indictment, treating his patient for legitimate medical purposes and in the usual course of professional practice.

**GOOD PROFESSIONAL PRACTICE**

The American Academy of Pain Medicine is a professional organization whose physician members spend a significant portion of their professional activities within the field of Pain Medicine or related disciplines.  In 2013 the AAPM released a statement regarding the use of opioids for the treatment of chronic pain (Ref: AAPM). In this statement, the AAPM listed what they describe as "the basic principles of good professional practice," when prescribing opioids. The five principles are: (1) Evaluation of the patient; (2) Treatment plan; (3) Consultation as

needed; (4) Periodic review of treatment efficacy; and (5) Documentation. In caring for MS, Dr. Kousa, to varying degrees, incorporated all five of these principles of good medical practice.

**CONCLUSIONS**

Regarding Counts 1-5 of the Indictment, although MS was an undercover agent posing as a legitimate patient, MS engaged Dr. Kousa claiming to having a legitimate medical need. Dr. Kousa respected MS's report of pain treated MS in the manner one would expect of a physician. Dr. Kousa, a fully educated, experienced, and licensed physician, treated MS for a legitimate medical purpose, with medications that were prescribed in a reasoned, logical, and appropriate manner. Dr. Kousa did not run a pain clinic. He was not a pain specialist. In treating pain, he should be held to the standards of similarly situated and trained primary care physicians. However, Dr. Kousa was a specialist in internal medicine, and he practiced in primary care and internal medicine. In the usual course of professional practice, as an internist, Dr. Kousa treated MS as whole person, not just a patient with pain, and he did so within the accepted scope of practice for a primary care physician and internist.

Dr. Kousa's patient MS had pain, which constituted a legitimate medical purpose for treatment. Dr. Kousa's care was directed at alleviating MS's suffering. Dr. Kousa's process included methodical assessments and re-assessments, continually gathering the information he needed, which, based on his clinical judgment, guided him in the treatments he provided to MS.

Specifically, with respect to the medications named in the Indictment, applying the standards outlined in this report, I conclude that Dr. Kousa's prescriptions for MS in Counts 1-5 were issued for a legitimate medical purpose and in the usual course of professional practice in an authorized manner.

Regarding Count 6 of the Indictment, the documentation from the clinical encounters listed on the Indictment could be used to support E/M the CPT codes chosen by Dr. Kousa.

Regarding Count 7 of the Indictment, I have determined that electrocardiograms performed in caring for patient LG were medically necessary.

Regarding Count 8 of the Indictment, I have determined that the documentation of the physical exam of Patient MS on 5/13/2021 likely contains errors. However, I do not believe the documentation errors on 5/13/2023 prove that Dr. Kousa knowingly committed fraud. Errors in documentation due to EHR's are commonplace in most every healthcare setting.

Regarding Count 9 of the Indictment, of which a supposed April 23, 2021 clinical encounter is the subject, I found documentation of clinical work on that day on behalf of MS, but there was no documentation that a patient-provider clinical encounter occurred. If there was no clinical encounter on April 23, 2021, then analysis with respect to allegations of fraud in connection with a clinical encounter on that date is moot.

Respectfully,

James Patrick Murphy, MD, MMM, DFASAM

26

**REFERENCES** (in alphabetical order):

**AAPM** - Use of Opioids for the Treatment of Chronic Pain *A statement from the* American Academy of Pain Medicine. - Approved February 2013

**CAMA** - For example, see this excerpt from the AMA's *COVID-19 policy recommendations for OUD, pain, harm reduction.* https://www.ama-assn.org/delivering-care/public-health/covid-19-policy-recommendations-oud-pain-harm-reduction

**CDC** - CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016.

**CFR** - Code of Federal Regulations, Title 21, Part 1306.04 (21 CFR Part 1306.04).

**COCH** - Long-term opioid management for chronic noncancer pain. Cochrane Database of Systematic Reviews 2010, Issue 1. Art. No.: CD006605. DOI: 10.1002/14651858.CD006605.pub2.

**CODE** - AMA Code of Medical Ethics Opinion 1.1.1

**CPF** - O'Donnell HC, Kaushal R, Barrón Y, Callahan MA, Adelman RD, Siegler EL. Physicians' attitudes towards copy and pasting in electronic note writing. J Gen Intern Med. 2009 Jan;24(1):63-8. doi: 10.1007/s11606-008-0843-2. Epub 2008 Nov 8. PMID: 18998191; PMCID: PMC2607489.

**DEA19** - DEA COVID-19 Information Page; deadiversion.usdoj.gov/coronavirus Accessed November 3, 2022.

**EXT** - Statement from the DEA Administrator Anne Milgram on COVID-19 Telemedicine Flexibilities for Prescription of Controlled Medications. May 03, 2023.

**FED06** - Federal Register/Vol. 71, No. 172/Wednesday, September 6, 2006/Notices.

**FLEX** – Press Release: AMA statement on DEA extending telehealth prescription flexibilities. Bobby Mukkamala, MD, Chair, AMA Substance Use and Pain Care Task Force, May 4, 2023.

**FRONT** - Front. Pharmacol., 01 October 2018. Sec. Neuropharmacology. The Challenge posed by New Synthetic Opioids: Pharmacology and Toxicology. https://doi.org/10.3389/fphar.2018.01122

**FSMT** - THE APPROPRIATE USE OF TELEMEDICINE TECHNOLOGIES IN THE PRACTICE OF MEDICINE - *Adopted by the FSMB House of Delegates, April 2022*

**GABA** - Appropriate Gabapentin Dosing for Neuropathic Pain. Pharmacy Times, Dec 20, 2017 by Jeffrey Fudin, PharmD at https://www.pharmacytimes.com/view/appropriate-gabapentin-dosing-for-neuropathic-pain

**IASP** - International Association for the Study of Pain: IASP Announces Revised Definition of Pain. July 16, 2020.

**KAR** - 201 KAR 9:260. Professional standards for prescribing, dispensing, and administering controlled substances.

**LAN** - The Lancet, Series from the Lancet journals: Chronic Pain; May 27, 2021.

**MASS** - The Massachusetts General Hospital Handbook of Pain Management, Second Ed.

**MOFF** - Moffett P, Moore G. The standard of care: legal history and definitions: the bad and good news. West J Emerg Med. 2011;12(1):109-112.

**NAS** - National Academies of Sciences, Engineering, and Medicine 2015. *Improving Diagnosis in Health Care*. Washington, DC: The National Academies Press. https://doi.org/10.17226/21794.

**NP**- Gabapentin as an Adjuvant to Opioid Analgesia for Neuropathic Cancer Pain. *Journal of Pain and Symptom Management, Vol. 17 No. 6 June 1999* by Augusto Caraceni, MD, Ernesto Zecca, MD, Cinzia Martini, MD, and Franco De Conno, MD.

**OSLER** - Uncertainty in Medicine, The Lancet, Published:May 15, 2010DOI:https://doi.org/10.1016/S0140-6736(10)60719-2

**PAPER** - Four Things to Know About CMS' "Patients Over Paperwork" Input Request by Timothy Fry and Anna Timmerman, July 9, 2019, www.jdsupra.com

**PHE** - Fact Sheet: COVID-19 Public Health Emergency Transition Roadmap. HHS press release: February 9, 2023. https://www.hhs.gov/about/news/2023/02/09/fact-sheet-covid-19-public-health-emergency-transition-roadmap.html

**ROP** - *Responsible Opioid Prescribing, Second Ed. Copyright 2012, trademarked by the Federation of State Medical Boards Research and Education Foundation and published with support from the Substance Abuse and Mental Health Services Administration, U.S. Dept. of Health and Human Services.*

**SCI** -  Muna Subedi, Shalini Bajaj, Maushmi S. Kumar, Mayur YC, An overview of tramadol and its usage in pain management and future perspective, Biomedicine & Pharmacotherapy, Volume 111, 2019, Pages 443-451, ISSN 0753-3322.

**SPE** – Coronavirus in Kentucky, Spectrum News. Explore A Year of COVID-19: Explore the Past and Future in Kentucky, the Past and Future in Kentucky. By Brandon Roberts Kentucky. PUBLISHED 1:00 PM ET Mar. 09, 2021. https://spectrumnews1.com/ky/louisville/news/2021/03/08/kentucky-year-of-covid-19

**STA** - Counties with highest COVID-19 infection rates in Kentucky. Published by Stacker on November 17, 2022:
https://stacker.com/kentucky/counties-highest-covid-19-infection-rates-kentucky

**TREE**- How to Prescribe Controlled Substances to Patients During the COVID-10 Public Health Emergency. Prior to May 11, 2023 this chart was available on the DEA website at: https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-023)(DEA075)Decision_Tree_(Final)_33120_2007.pdf

**UPDATE** - CDC Clinical Practice Guideline for Prescribing Opioids for Pain — United States, 2022, *Recommendations and Reports* / November 4, 2022.

# James Patrick Murphy MD MMM DFASAM

Murphy Pain Center (office)
720 Rolling Creek Drive, Suite 101
New Albany, Indiana 47150
Phone: (502) 736-3636, Fax: (877) 497-8259
Website: murphypaincenter.com

P.O. Box 436864
Louisville, Kentucky 40253-6864
jpmurp01@louisville.edu (UofL)
jpmurphy@murphypaincenter.org (Business)
State licenses: Kentucky, Indiana

## CERTIFICATIONS

American Board of Anesthesiology
| | |
|---|---|
| • Consultant in Anesthesiology (lifetime) | 1994 |
| • Subspecialty Certification in Pain Medicine | 1996 |
| • Subspecialty Recertification in Pain Medicine | 2007 |
| • Subspecialty Recertification in Pain Medicine | 2017 |
| • Maintenance of Certification in Pain Medicine | current |

| | |
|---|---|
| American Board of Pain Medicine (lifetime) | 1997 |

American Board of Preventive Medicine
| | |
|---|---|
| • Subspecialty Certification in Addiction Medicine | 2017 |
| • Maintenance of Certification in Addiction Medicine | current |

| | |
|---|---|
| American Board of Addiction Medicine | 2014 |
| American Society of Addiction Medicine | 2004 |

## EDUCATION AND TRAINING

| | |
|---|---|
| University of Southern California • Master of Medical Management (MMM) | 2013 |
| Mayo Clinic, Rochester, MN • Pain Management Fellowship | 1998 |
| University of Louisville • Anesthesiology Residency | 1992 |
| Naval Aerospace Medical Institute • Aerospace Medicine/Naval Flight Surgeon | 1987 |
| Naval Medical Center, San Diego, CA • Psychiatry Internship | 1986 |
| University of Louisville School of Medicine • Doctor of Medicine | 1985 |
| Westminster College, Fulton, MO • B.A. English | 1981 |

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| University of Louisville School of Medicine • Clinical Prof., Dept. of Anesthesiology | 1998 - 2000 & 2004 - current |
| Mayo Medical School, Rochester, MN • Instructor of Anesthesiology | 1997 - 1998 |

## EMPLOYMENT

| | |
|---|---|
| Murphy Pain Center • President and Medical Director | 2000 - current |
| Mayo Clinic, Rochester, MN • Associate Consultant Physician | 1997 - 1998 |
| Heartland Anesthesiologists, Elizabethtown, KY • Anesthesiologist | 1992 - 1997 |
| United States Navy • Physician/Flight Surgeon/Anesthesiologist (Commander) | 1982 – 2010 |

## ASSOCIATIONS

American Medical Association (current)
American Society of Addiction Medicine
- • Distinguished Fellow, American Society of Addiction Medicine (DFASAM 2021 - current)
- • Director, Region X (2023 - current)
- • Representing ASAM on AMA Substance Use and Pain Care Task Force: (2021 - current)
- • Representing ASAM on AMA Pain Care Task Force: (2018 - 2021)

Kentucky Society of Addiction Medicine, President (2020 - 2022)
Kentucky Society of Addiction Medicine, Board of Directors (2020 - current)
Kentucky Harm Reduction Coalition, Board of Directors (2019 - current)
Kentucky Department for Public Health, Displaced Opioid Patient Work Group (2019 - current)
Greater Louisville Medical Society (President 2013 - 2014)
Kentucky Medical Association (Community Connector Leadership Program 2013)

jpm 3/12/2023

**James Patrick Murphy, MD**

**Past Four Years Expert Witness Testimony at Trial or Deposition as of March 20, 2023**

1. USA vs. WILLIAM LAWRENCE GREGORY SIEFERT, M.D.  United States District Court, Eastern District of Kentucky, Northern Division, Covington. Case no. 2:21-cr-2-DLB-CJS. March 2023.
2. THE PEOPLE OF THE STATE OF NEW YORK vs. SUDIPT DESHMUKH. Supreme Court of the State of New York, County of Monroe. Indictment no. 2021-0059. March 2023.
3. USA vs. GILBERT R. GHEARING. U.S. District Court, Middle District of Tennessee, Northeastern Division. Case no. 2:19-00010. March 2023.
4. USA vs. CHARLES KISTLER, D.O.  U.S. District Court, Southern District of Ohio, Eastern Division. Case no. 2:22-cr-00067-ALM. February 2023.
5. USA vs. FREEDA FLYNN. U.S. District Court, Southern District of Ohio, Eastern Division. Case no. 2:19-CR-208. January 2023.
6. USA vs. LESLY POMPY, MD. U.S. District Court, Eastern District of Michigan, Southern Division. Case no. 18-CR-20454. December 2022.
7. USA vs. THOMAS KELLER. U.S. District Court, Northern District of California, San Francisco. Case no. 3:18-cr-00462-VC. October 2022.
8. USA vs. DAVID W. SUETHOLZ, M.D. United States District Court, Eastern District of Kentucky, Northern Division, Covington. Case no. 2:21-CR-56-S-DLB. September 2022.
9. USA vs. SALOUMEH RAHBARVAFAEI, United States District Court for the Central District of California. Case no. 2:19-CR-00164. August 2022.
10. USA vs. THOMAS ROMANO. United States District Court, Southern District of Ohio, Eastern Division. Case no. 2:19-CR-00202-SDM. August 2022.
11. USA vs. DR. DAVID LEWIS, United States District Court, Eastern District of Michigan, Southern Division. Case no. 2:18-CR-20800
12. USA vs. HAU T. LA, United States District Court, Middle District of Tennessee, Nashville Division. Case no. 3:22-CR-00163. July 2022.
13. USA vs. HAU T. LA, United States District Court, Middle District of Tennessee, Nashville Division. Case no. 3:22-CR-00163. Daubert hearing. July 11, 2022.
14. **DIANE RECTOR as personal representative of the estate of Lisa Mae Arndt, Plaintiff, vs. IDEAL OPTION PLLC, Defendant. CAUSE NO. CV-21-02-GF-BMM-JTJ. IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA GREAT FALLS DIVISION. Expert witness deposition: February 1, 2022.**
15. USA vs. EUGENE SISCO III, United States District Court, Eastern District of Kentucky, Southern Division, Pikeville. Case number 7:20-CR-00023-REW-HAI. November 2021.
16. USA vs. JEFFREY CAMPBELL, United States District Court, Western District of Kentucky at Louisville. Case number 3:17CR-87-RGJ. May 2021.
17. USA vs. RICKY L. HOUDERSHELDT, D.O., Defendant. United States District Court for the Southern District of West Virginia, Huntington Division. CRIMINAL ACTION NO. 3:19- 00239 12-23-2020 (S.D.W. Va.). Sentencing trial. December 2020.
18. USA vs. KRISHAN KUMAR AGGARWAL and CHERIAN JOHN, Defendants. U.S. District Court for the Northern District of West Virginia. Case No. 5:18-cr-16-FPS. June 2019.
19. USA vs. NASHER-ALNEAM. U.S. DISTRICT COURT SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON. Case number 2:18-cr-151. April 2019.
20. USA vs. NASHER-ALNEAM. U.S. DISTRICT COURT SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON. Case number 2:18-cr-151. Daubert hearing. March 2019.

JPM/March 20, 2023